CLARK, ATTORNEY GENERAL, AS SUCCESSOR TO THE ALIEN PROPERTY CUSTODIAN, *v.* UEBERSEE FINANZ-KORPORATION, A. G.

No. 35.   Argued May 1, 1947.—Reargued November 12, 1947.—
Decided December 8, 1947.

*M. S. Isenbergh* argued the cause for petitioner. With him on the brief were *Acting Solicitor General Washington, Assistant Attorney General Sonnett, Stanley M. Silverberg, Harry LeRoy Jones, James L. Morrisson* and *John Ward Cutler.*

*Richard J. Connor* argued the cause for respondent. With him on the brief was *Bart W. Butler.*

*Wm. Harvey Reeves* filed a brief for the National Foreign Trade Council, Inc., as *amicus curiae,* urging affirmance.

Mr. Justice Douglas delivered the opinion of the Court.

Respondent brought this suit to reclaim property which the Alien Property Custodian,[1] acting under § 5 (b) of the Trading With the Enemy Act, 40 Stat. 411, 50 U. S. C. App. § 1, as amended by the First War Powers Act of 1941, 55 Stat. 839, 50 U. S. C. App. (Supp. V, 1946), § 5 (b), had vested in himself. Respondent is a corporation organized under the laws of Switzerland and having its principal place of business in that country. The property seized consisted of shares of stock in corporations organized under the laws of various States of this nation and of an interest in a contract between two such corporations.

The complaint alleges that respondent is not an enemy or ally of an enemy and that at no time at or since the vesting has the property in question been owned or controlled, directly or indirectly, in whole or in part, by an enemy, ally of an enemy, or a national of a designated enemy country. It also alleges that none of the property has been owing or belonging to or held on account of or for the benefit of any such person or interest. We construe these allegations to mean that the property is free of all enemy taint and particularly that the corporations whose shares have been seized, the corporations which have a contract in which respondent has an interest, and respondent itself, are companies in which no enemy, ally of an enemy, nor any national of either has any interest of any kind whatsoever, and that respondent has not done business in the territory of the enemy or any ally of an enemy. Those allegations, as so construed, are indeed taken as true for the purposes of the present ruling, since petitioner's motion to dismiss is based solely on the fact that respondent is a national of a foreign country.

---

[1] The powers and functions of the Custodian were subsequently transferred to the Attorney General. Executive Order No. 9788, 11 Fed. Reg. 11981 (Oct. 14, 1946).

The District Court granted petitioner's motion to dismiss. The Court of Appeals reversed, one justice dissenting. 81 U. S. App. D. C. 284, 158 F. 2d 313. The case is here on petition for a writ of certiorari which we granted because of the importance of the question in the administration of the Act. 330 U. S. 813.

Under the Act as it read prior to the 1941 amendment respondent would have been able to maintain this suit on a showing, without more, that it was a corporation organized under the laws of a friendly nation and not doing business in the territory of an enemy nation or any of its allies. That result would be reached as follows: Sec. 7 (c) permitted seizure by the Custodian only of property in which an enemy or ally of an enemy had an interest. Sec. 9 (a) permitted "any person not an enemy or ally of enemy" claiming an interest in any seized property to sue to reclaim it. And the Court held in *Behn, Meyer & Co.* v. *Miller,* 266 U. S. 457, that a corporation organized under the laws of a friendly nation and not doing business in the territory of an enemy nation or any of its allies [2]

---

[2] Sec. 2 provides:

"That the word 'enemy,' as used herein, shall be deemed to mean, for the purposes of such trading and of this Act—

"(a) Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or resident outside the United States and doing business within such territory, and any corporation incorporated within such territory of any nation with which the United States is at war or incorporated within any country other than the United States and doing business within such territory.

"(b) The government of any nation with which the United States is at war, or any political or municipal subdivision thereof, or any officer, official, agent, or agency thereof.

"(c) Such other individuals, or body or class of individuals, as may be natives, citizens, or subjects of any nation with which the United States is at war, other than citizens of the United States, wherever resident or wherever doing business, as the President, if

could maintain such a suit even though the corporation was enemy owned or controlled. The scheme of the Act as it was then drawn was "to seize the shares of stock when enemy owned rather than to take over the corporate property." *Hamburg-American Co.* v. *United States,* 277 U. S. 138, 140.

That was at least one respect in which the Act had a "rigidity and inflexibility" that was sought to be cured by the amendment to § 5 (b) in 1941. See H. R. Rep. No. 1507, 77th Cong., 1st Sess., p. 3. It was notorious that Germany and her allies had developed numerous techniques for concealing enemy ownership or control of property which was ostensibly friendly or neutral. They had through numerous devices, including the cor-

---

he shall find the safety of the United States or the successful prosecution of the war shall so require, may, by proclamation, include within the term 'enemy.'

"The words 'ally of enemy,' as used herein, shall be deemed to mean—

"(a) Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation which is an ally of a nation with which the United States is at war, or resident outside the United States and doing business within such territory, and any corporation incorporated within such territory of such ally nation, or incorporated within any country other than the United States and doing business within such territory.

"(b) The government of any nation which is an ally of a nation with which the United States is at war, or any political or municipal subdivision of such ally nation, or any officer, official, agent, or agency thereof.

"(c) Such other individuals, or body or class of individuals, as may be natives, citizens, or subjects of any nation which is an ally of a nation with which the United States is at war, other than citizens of the United States, wherever resident or wherever doing business, as the President, if he shall find the safety of the United States or the successful prosecution of the war shall so require, may, by proclamation, include within the term 'ally of enemy.' "

poration, acquired indirect control or ownership in industries in this country for the purposes of economic warfare.[3]   Sec. 5 (b) was amended on the heels of the declaration of war to cope with that problem.   Congress by that amendment granted the President the power to vest in an agency designated by him "any property or interest of any foreign country or national thereof."[4]   The property of all foreign interests was placed within reach of the vesting power, not to appropriate friendly or neutral assets but to reach enemy interests which masqueraded under those innocent fronts.

Thus the President acquired new "flexible powers" (H. R. Rep. No. 1507, *supra,* p. 3) to deal effectively

---

[3] Some of the uses of the corporation in promotion of these subversive projects are summarized in Administration of the Wartime Financial and Property Controls of the United States Government, Treasury Dept. (1942), pp. 29–30.   It is pointed out that technical legal title "to some of the most dangerous of the Axis-influenced enterprises may be Swiss, Dutch, Swedish or American."   It is also said that "Actual ownership of business enterprises frequently runs through tangled mazes of holding companies.   These holding companies were normally incorporated in neutral countries and the ownership of the holding companies themselves was normally represented by bearer shares, making it extremely difficult to negate a claim that the ownership of the corporation was coincident with the state of incorporation."

[4] Sec. 5 (b) (1), as amended, also granted the President the power to "investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States . . . ."

Sec. 5 (b) (1), as amended, further provided as respects property which had been vested that "upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States . . . ."

with property interests which had either an open or concealed enemy taint.

While the scope of the President's power was broadened, there was no amendment restricting the scope of § 9 (a). As we have noted, § 9 (a) granted "any person not an enemy or ally of enemy," claiming an interest in property seized, the right to reclaim it. So the provision reads today. Yet, as petitioner suggests, if *Behn, Meyer & Co.* v. *Miller, supra,* is applied despite the 1941 amendment, § 9 (a) will undo much of the good which the 1941 amendment to § 5 (b) was designed to accomplish. All a corporate claimant would need do to recover the property seized would be to show that it was organized in this country or in some friendly or neutral country and was not doing business within the territory of an enemy or any of its allies.[5] The fact that it was owned or controlled by enemy interests and might sap the strength of this nation through economic warfare would be immaterial. We agree that a construction so destructive of the objectives of the 1941 amendment to § 5 (b) must be rejected.

Petitioner therefore suggests that once the seizure is shown to be permissible under § 5 (b), there is no remedy for the return of the property under § 9 (a). It is said that § 9 (a) was designed to provide an ultimate judicial determination of the question whether the property seized was within the vesting power defined in § 5 (b). *Central Trust Co.* v. *Garvan,* 254 U. S. 554, 567–568. The argument accordingly is that since § 5 (b) allows seizure and vesting of "any property or interest of any foreign country or national thereof," a suit to reclaim it is defeated by a mere showing that the claimant is a corporation organized under the laws of another nation.

That is to make the right to sue run not to "any person not an enemy or ally of enemy" as § 9 (a) in terms pro-

---

[5] See note 2, *supra.*

vides but to "any person not an enemy or ally of enemy or national of any foreign country." That would wipe out all suits to reclaim property brought by any foreign interest, no matter how friendly. We stated in *Markham* v. *Cabell*, 326 U. S. 404, 410–411, "The right to sue, explicitly granted by § 9 (a), should not be read out of the law unless it is clear that Congress by what it later did withdrew its earlier permission." Such a drastic contraction, if not complete sterilization, of § 9 (a) as petitioner suggests should therefore be made only if no other alternative is open.

There are several reasons which make us hesitate to take that course. In the first place, as we have suggested, the phase of the problem with which we are presently concerned and with which Congress was wrestling when it amended the Act in 1941 started and ended with property having an enemy taint. We find not the slightest suggestion that Congress was concerned under this Act with property owned or controlled by friendly or neutral powers and in no way utilized by the Axis. Those interests were not waging economic warfare against us. Secondly, we are dealing here with the power "to affirmatively compel the use and application of foreign property in a manner consistent with the interests of the United States." [6] Sen. Rep. No. 911, 77th Cong., 1st Sess., p. 2. It is hard for us to assume that Congress adopted that drastic course in the case of friendly or neutral foreign interests whose investments in our economy were in no way infected with enemy ownership or control. Our hesitation is, moreover, increased when we note that § 7 (c) makes the remedy under the Act the only one Congress has granted a claimant. It is not easy for us to assume that Congress treated all non-enemy nations, including

---

[6] As to the powers of the custodian or other agency designated by the President over the property, see § 5 (b) (1), *supra* note 4, and § 12.

our recent allies, in such a harsh manner, leaving them only with such remedy as they might have under the Fifth Amendment.

The problem is not without its difficulties whichever way we turn. But we think that we adhere more closely to the policy of both § 5 (b) as amended and § 9 (a), if we do not carry over into the amended Act the consequences of *Behn, Meyer & Co.* v. *Miller, supra.*

As we have observed, the scheme of the Act when *Behn, Meyer & Co.* v. *Miller* was decided was to respect the corporate form, even though the enemy held all the stock of the corporate claimant. *Hamburg-American Co.* v. *United States, supra.* The 1941 amendment to § 5 (b) reflected a complete reversal in that policy. The power of seizure and vesting was extended to all property of any foreign country or national so that no innocent appearing device could become a Trojan horse. Congress did not, however, alter the definitions of enemy or of ally of enemy contained in § 2. They remain the same as they were at the time *Behn, Meyer & Co.* v. *Miller* was decided.[7]

Yet if the question were presented for the first time under the amended Act, we could not confine the statutory definitions of enemy or ally of enemy to the narrow categories indicated by *Behn, Meyer & Co.* v. *Miller.* To do so would be to run counter to the policy of the Act and be disruptive of its purpose. We are dealing with hasty legislation which Congress did not stop to perfect as an integrated whole. Our task is to give all of it—1917 to 1941—the most harmonious, comprehensive meaning possible. *Markham* v. *Cabell, supra.* So if the definitions contained in § 2 [8] are to be harmonized with the policy underlying § 5 (b) and § 9 (a) of the amended Act, we would have to say that they are merely illus-

---

[7] See note 2, *supra.*

[8] See note 2, *supra.*

trative, not exclusionary. To do otherwise would be to impute to Congress a purpose to paralyze with one hand what it sought to promote with the other.

There is perhaps in logic some basis for saying that that should be the consequence since Congress did not amend § 2 when it revised the Act by its amendment of § 5 (b). The argument is that the only change effected was in § 5 (b) and that § 2 which stands unamended should be taken to mean what it meant before 1941. But the answer to our problem cannot be had by the use of logic alone. We are dealing here with conflict and confusion in the statute. Though neither § 2 nor § 9 (a) was amended with § 5 (b) in 1941, one of them must be read differently after than before that event. We believe it is more consonant with the functions sought to be served by the Act to apply § 2 differently than it was previously applied than to read § 9 (a) more restrictively. We believe a more harmonious reading of § 2, § 5 (b) and § 9 (a) is had if the concept of enemy or ally of enemy is given a scope which helps the amendment of 1941 fulfill its mission and which does not make § 9 (a) for the first time in its history and contrary to the normal connotation of its terms stand as a barrier to the recovery of property by foreign interests which have no possible connection with the enemy.

It is suggested, however, that this approach may produce results which are both absurd and uncertain. It is said that the entire property of a corporation would be jeopardized merely because a negligible stock interest, perhaps a single share, was directly or indirectly owned or controlled by an enemy or ally of an enemy. It is also pointed out that securities or interests other than stock might be held by an enemy or ally of an enemy and used effectively in economic warfare against this country. But what these interests are, the extent of holdings necessary to constitute an enemy taint, what part of a friendly alien

corporation's property may be retained where only a fractional enemy ownership appears, are left undecided. Since we assume from the allegations of the complaint that respondent is free of enemy taint and therefore is not within the definition of enemy or ally of an enemy, those problems are not now before us. We recognize their importance; but they must await legislative[9] or judicial clarification.

*Affirmed.*

THE CHIEF JUSTICE took no part in the consideration or decision of this case.

---

[9] See 60 Stat. 50, adding § 32 (a) (2) (E) to the Act.