**KOTOHIRA JINSHA v. McGRATH, Attorney General.**

Civ. No. 904.

United States District Court
D. Hawaii.

June 5, 1950.

Robertson, Castle & Anthony, J. Garner Anthony, Frank D. Padgett, all of Honolulu, T. H., for plaintiff.

Ray J. O'Brien, United States Attorney, District of Hawaii, Leon R. Gross, Department of Justice, Assistant United States Attorney, Howard Hoddick, District of Hawaii, all of Honolulu, T. H., for defendant.

McLAUGHLIN, District Judge.

This opinion is filed as a supplement to the oral ruling made at the close of argument May 18, 1950.

■ On March 31, 1949, the plaintiff, an Hawaiian corporation, filed this Section 9 suit under the Trading with the Enemy Act, 50 U.S.C.A.Appendix § 9, to recover two parcels of real estate, personal property and a debt vested by the ʼCustodian June 1, 1948, and also damages for wrongful seizure and detention. No evidence was tendered as to the personal property or the debt; nor was attention given by the parties to the question of damages, due, no doubt, to the fact that the Court ruled that the correctness of the Vesting Order was not open for judicial inquiry. United States v. The Antoinetta, 3 Cir., 1945, 153 F.2d 138; The Aussa, D.C.D.N.J.1943, 52 F.Supp. 927.

In May the Government moved for a summary judgment, as did also the plaintiff. Subsequently both motions were denied, and, the complaint being amended, the defendant, after losing a motion to dismiss, answered the amended complaint and the case moved into the area of depositions and discovery. Several trial dates were set and later changed, largely at the defendant's request. When, finally, a new firm trial date was set, a few days before it arrived the defendant announced that it was necessary for it to send one of its attorneys to Japan to collect evidence if it was to defend the suit properly. The Court refused to alter the trial date (March 27, 1950), but allowed Attorney Gross of the Alien Property Custodian's local office to go to Japan, with the understanding that the plaintiff would put in its case—Assistant United States Attorney Hoddick representing the Government—which was estimated to take some two weeks. It was said that Attorney Gross would be back in approximately ten days. This turned out to be like most estimates of time by attorneys, so when the plaintiff finished its case on April 11, 1950, the Court recessed the trial until May 3, at which time Attorneys Gross and Hoddick presented the Government's case. The trial ended May 17, with a ruling being made in plaintiff's favor on May 18, at the close of a two-day argument upon the facts and the law.

As detailed Findings of Fact will be found below, it will suffice to state the issue and the reasons for my decisions generally.

To appreciate the issue, these facts should be stated:

1. This Hawaiian eleemosynary corporation, the vast majority of whose members were alien Japanese, had been engaged in operating a Shinto shrine in Honolulu for years prior to December 7, 1941. On that date it ceased operations due to the suspicions engendered by the war and on account of orders of the Military Government then and thereafter until October 24, 1944, obtaining in Hawaii and possibly also due to the impact of the financial controls of the Treasury Department freeze orders. Very practically, it was not healthy to operate the shrine during those days, and besides plaintiff's Shinto priest was interned and repatriated to Japan, where he now resides. After the shooting war to the date of vesting plaintiff also did not function because of a continuation of the wide and commonly accepted belief that Shintoism was suspect, and, too, no priest was available, though his services seem not to have been vital.

2. The plaintiff's property consisted essentially of two parcels upon which was located the shrine, a social hall, and a house for the priest and his family. Due to the presence of a torii in front of the shrine and to its general appearance as well, it can be said that plaintiff's shrine looked like a state Shinto shrine in Japan.

3. At plaintiff's shrine three gods were enshrined, but as revealed by the expert testimony, plaintiff and its incompletely informed members did not even know their gods' correct names, nor why they worshipped them. The principal god enshrined was Kotohira, or, as it has come to be known, Kompira, a god of the sea. To this god the members probably felt indebted for their safe sea journey years ago from Japan to Hawaii. At a subsequent time, the god Hachiman, sometimes referred to as Shirasaki Hachimangu, was enshrined as a village god of many who came from the prefectures in Japan where the god was widely accepted as a village god. This god and its local followers were adopted by plaintiff primarily to increase the revenue. Hachiman, in addition, was popularly known in Japan as a god of war, but few of plaintiff's members seemed to know or were willing to admit this. On the other hand, Hachiman appears not to have been the only God of war in modern, pre-World War II state Shintoism in Japan. The third god also adopted by plaintiff was Otaki, who seems to have been a plain and simple village god in Japan. Since plaintiff and its members called him "Otaki Jinsha" he would appear to have been a god of a state Shinto shrine in Japan, for the word "jinja" or "jinsha" denotes a state shrine in Japan—before 1945 at least.

In addition to paying special but almost blind attention to these three gods—but not all of plaintiff's members worshipped all three or even two of them—plaintiff and its members for good measure also paid a general tribute of worship to the eight million gods in the Shinto pantheon of gods, which of course included Amaterasu Omikami, the sun goddess, deemed to be the Emperor's ancestor and hence a principal deity.

Though plaintiff's members followed a set prayer called an Oharae or a Norito taken from an ancient book of Shinto ritual, which in part at least was sanctioned by the Japanese government as to state shrines prior to 1945, followers of the god Kompira also had a very elementary set of rules, "Friends of Worshiping Kotohirajinja," which might be labeled a code of basic ethics.

Twice a year for each god, grand festivals were held to honor the particular god and to raise funds for the priest, and monthly prayer meetings were conducted at least as to the god Kompira. For the other two gods reverence clubs existed. Plaintiff's priest was trained as a state Shintoist in Japan, and was called by plaintiff to serve in Hawaii from a state shrine in Japan—the shrine of Hachimangu at Shirasaki, Yamaguchi Prefecture.

Plaintiff's witnesses (who to be sure for the most part could not agree as to the nature of their common beliefs or upon the reasons therefore—indeed some of them were reluctant to testify or testified grudgingly and were resentful of what the Government had done to plaintiff and to some of them by way of internment) generally stated they prayed for health, happiness,

and peace. They admitted they respected both the Emperor of Japan and the President of the United States, and said their priest in his sermons, talks or addresses told them that while living in this their adopted country they must respect the President and obey the laws of the United States. Though the Japanese word for worship and respect seems hard to translate accurately, witnesses generally agreed that they respected the Japanese Emperor as a descendent of a god rather than as a god in living human form—even if some ignorantly claimed to worship him as a true god. One or two of the witnesses called by the Government conceded that prewar and before 1930 the Emperor's birthday in April was celebrated at and in the shrine by the priest and a few members, but that after 1930 the Japanese Consul took over this celebration matter. It does not appear that plaintiff's members ever celebrated the Emperor's birthday on any sizable scale at the shrine. It does appear that at the shrine the first five days of January were celebrated, as was done in Japan, too; that some of the members knew of the doctrines of Hakko-ichi-u—world brotherhood, one world—which in Japan the militarists had distorted to mean "world under one roof" or Japanese supremacy and world conquest; and that a good deal of plaintiff's equipment may have been acquired from Japan. Indeed, by virtue of plaintiff having for the gods Hachiman and Otaki (but not for Kompira) a "mitayma" (part of the god's spirit enclosed in a "shintai," a box in which was a silk bag obscuring the spirit from human eyes), which identical thing when in transit from another shrine—usually in Japan—was called a "gobunrei," plaintiff could be called a branch of a state shrine "Hachimangu" in Japan and of "Otaki Jinja" in Japan. However, even the Government expert agreed that the tie of a branch shrine to a parent shrine was simply one of love and affection and denoted no control of any kind of one by the other.

4. In Japan, at the time of Restoration in 1868, to unify the nation and foster respect for the Emperor and a spirit of nationalism, the Japanese government adopted Shintoism—Way of the Gods—as a tool to be sued to that end. It, therefore, took over control of this primitive mythology which had been developing since late in the 6th Century and which had been preserved against the inroads of Buddhism (incidentally most Shintoists are also Buddhists), and distorted it to its own ends. To preserve the illusion of freedom of religion, it declared in 1900 that Shinto was not a religion under the Constitution of 1889. It set up a Bureau of Shrines and a Bureau of Religions. The official cult was called Jinja Shinto, administered by the Bureau of Shrines which controlled and supported the Shinto priests and three classes of Jinja or state shrines. These classes whose names all ended in "sha" or "gu" were (1) Government Shrines, (2) National Shrines, and (3) official shrines under which came village shrines and 63,000 ungraded shrines. Under the Bureau of Religions came the supervision of Sect Shintoism (11 out of 13 Sect Shinto shrines oddly worshipped the same gods as were enshrined in Jinja shrines but in a religious way), Buddhism and Christianity. All good Japanese were expected to attend a state Shinto shrine where the ritual was prescribed by the government. No sermonizing was done there, that being left to the school and the home. A subject might also attend a Sect shrine or a church, where religious doctrine was expounded. In Sect shrines there was no state support and ministers were called teachers rather than priests.

As noted, to accomplish the ends desired by the militarists of Japan, Shinto was distorted and state Shrine loyalty became a test of patriotism and the false doctrine of Japanese supremacy and eventual world domination was fostered, which lead to its ultimate defeat in World War II.

5. The evidence does not establish any Japanese governmental control, direct or indirect, of this plaintiff, nor any direct or indirect doctrinal or financial control by any state shrine in Japan. If either or both existed it has not been revealed by the evidence in this case. The most that might be said from the evidence is that in addition to looking like a state Shinto shrine in Japan, the plaintiff may have also acted like one in some, but not all, respects. Actually

in the area of belief—or ideology as the Government prefers to call it—plaintiff's similarity of action in subscribing to primitive beliefs by and through shrine ceremonies may be taken to be more like Sect Shintoism. In any event, from the evidence I am not prepared to find affirmatively that it acted like a state Shinto shrine would act in Japan, nor even like a Sect Shinto shrine in Japan. I am not even prepared to find on this evidence that this plaintiff, operating in the United States of America, held beliefs which could be agreed to constitute a religion. All that this evidence shows is that this plaintiff operating in the United States of America prior to 1941 held itself out to be a Shinto shrine at which its members practiced by way of prayers and ceremonies a primitive mythology known as Shinto or Way of the Gods, with special attention to three gods, but whether the plaintiff's tenets were the same as state Shintoism in Japan, or even Sect Shintoism in Japan, has not been established by either party. Indeed, as earlier noted, plaintiff and its members did not even understand what it was they believed or why.

6. By an order of General MacArthur (Exhibit E) in 1945 in Occupied Japan, the control of the Japanese government over Shintoism was divested, and it was provided that thereafter Shintoism—Jinja Shintoism—would be recognized by the Supreme Commander for the Allied Powers as a religion for those who wished to accept it as such.

### Issue

In a Section 9 suit under the Trading with the Enemy Act, as amended, is the plaintiff, an Hawaiian corporation, a majority of whose officers and members are alien Japanese, which is not controlled by, acting or purporting to act, directly or indirectly, for the benefit of Japan as of the date of vesting and which is not an enemy or ally of an enemy under the Act, precluded from having its property returned because it looked like a Japanese state Shinto shrine and because its purposes and actions prior to 1941 were to foster amongst its members doctrines of Shintoism, with beliefs centered around or worship directed to three Shinto gods—Kompira, Shirasaki Hachimangu, and Otaki?

Expressed in simpler language, being otherwise eligible, is plaintiff barred because its beliefs give it an "enemy taint" and it must therefore be regarded, as the Attorney General in 1948 determined in vesting, as a "national of a designated enemy country" under Executive Order 9095, 50 U.S.C.A.Appendix, § 6 note, because the national interests of the United States so required?

### Conclusions

■ 1. Section 39 of the Act barring the return of property to a national of Japan is inapplicable to a Section 9 suit if the Court is bound by the Attorney General's determination that a person is a national of such a country under the Act and related Executive Order 9095.

Section 39, like Section 32, certainly applies to administrative returns and bars them, as the Attorney General is bound by his own determination. See McGrath v. Zander, 1949, 85 U.S.App.D.C. 334, 177 F. 2d 649.

But to hold that in a Section 9 suit the Court is bound by the multiple declarations of the Vesting Order, and hence Section 39 defeats a Section 9 suit before it even gets started would make a farce out of unamended Section 9, which Section the Supreme Court says is all that preserves the Act's constitutionality.

■ It is my holding that I am not bound by the Attorney General's determinations, and there is no evidence in the case upon which I could possibly find or hold as he did that the plaintiff was on the vesting date, July 1948, "controlled" by, etc., Japan. All of the evidence is to the contrary. If ever there was control from Japan, General MacArthur cut it off in 1945 long prior to the vesting date.

Nor is there any evidence upon which I could possibly find or hold that the national interests of the United States required that this little insignificant shrine in Hawaii, with not more than 500 members, should be deemed to be an economic, military, or even ideological threat to the United States.

No evidence on this score was presented. There was not a shred of evidence that plaintiff even endeavored to affect United States citizens or even that it ran a language school in which Japanese nationalism was slyly inculcated into United States citizens. Indeed, all the Shinto shrines in the United States (not many) put together would not threaten the United States even if in operation during the war in the absence of some subversive activity or circumstances presenting a clear and present danger of inducing harmful action.

Hence the case reduces itself to a question of whether on the date of vesting plaintiff was "enemy tainted" under the doctrine of the Uebersee case (Clark v. Uebersee Finanz-Korporation), 1947, 332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88.

In the Uebersee case upon the basis of Section 5(b) as amended, the Supreme Court was confronted with a contention like the one above indicated as to Section 39. In fact, it is the same proposition, for "national" must have a consistent meaning throughout the Act. In the Uebersee case the Supreme Court held the amendment to Section 5(b) affected Section 2, but not Section 9 save that thereafter a plaintiff would have to also prove the absence of "enemy taint." Just what "enemy taint" is seems to depend on the specific situation, though Section 32 was alluded to by the Court as illustrative. In any event upon retrial of the Uebersee case, the trial court held if ever there was a case of enemy taint that was it. Here, however, such facts as were developed by the evidence in the case control.

The plaintiff's evidence, as might be expected, disclosed no enemy taint, and the Government, which having vested certainly could be expected to show such, produced nothing of substance on the point—despite wide latitude, ample time, and ready access to sources in Occupied Japan.

But it is argued that the Court must be mindful of the times and of the danger to the United States of foreign ideologies. In this contention it is argued that Hitlerism, Communism, and Shintoism are but sisters under the skin, and who knows but the spirit of Shintoism might rise again to endeavor to conquer the world unless by vestings like this it is stamped out.

If Congress felt that way, it did not say so. Section 9 remains unamended, despite the addition of Section 39 in 1948 following the Uebersee case. If it did ever say so, immediate doubt as to the Act's constitutionality would arise.

In any event, with Japan under General MacArthur's thumb as of 1948, as well as now, with nothing more to point to than that, at worst plaintiff looked like and maybe up to 1941 acted like a state Shinto shrine would act in Japan—only this plaintiff is in the United States—and in the face of the MacArthur decree of 1945 and with no evidence of control of plaintiff by Japan or a shrine in Japan at any time, the argument has no other basis than emotion and fear. Legal actions are not decided upon such, nor by waving the flag.

The undisguised fact is that this plaintiff's property was vested—taken away—because what plaintiff believes in was disliked or suspected, and by taking away its base of operations, its fervor for its beliefs would tend to diminish and eventually vanish. Not until the evidence was concluded was I willing to even listen to argument on this point, for I could not believe it. I still do not believe the Attorney General really acted on such a basis—even though such evidence as the Court was given might so indicate.

■ We have not yet come to the point —nor will we ever while "this Court [also] sits"—where the Government can take away a person's property because it does not approve of what that person believes in or teaches by way of religion or philosophy of life. The First Amendment forbids. See American Communications Associations, C.I.O. v. Douds, 1950, 70 S.Ct. 674, 703, generally, and the dissenting portion of Mr. Justice Jackson's opinion wherein as to a similar proposition he states:

"* * * efforts to weed erroneous beliefs from the minds of men have always been supported by the argument which the Court invokes today, that beliefs are springs to action, that evil thoughts tend to become

forbidden deeds. Probably so. But if power to forbid acts·includes power to forbid contemplating them, then the power of government·over beliefs is as unlimited as its ·power over conduct and the way is open to force disclosure of attitudes on all manner of social, economic, moral and political issues.

"These suggestions may be discounted as fanciful and farfetched. But we must not forget that in our country are evangelists and zealots of many different political economic and religious persuasions whose fanatical conviction is that all thought is divinely classified into two kinds—that which is their own and that which is false and dangerous. * * * Our protection against all kinds of fanatics and extremists * * * lies not in their forbearance but in the limitations of our Constitution."

. [5] This vesting did unduly infringe a freedom protected by the First Amendment, and the plaintiff has proven itself eligible under the Act to have a judicial order directing the Custodian to return to it the vested property. And it will be so ordered formally when Findings of Fact and Conclusions of Law are settled upon notice.