**KAKU NAGANO v. McGRATH, Atty. Gen.**

**No. 10192.**

United States Court of Appeals Seventh Circuit.

Feb. 26, 1951.

Rehearing Denied April 4, 1951.

C. Lysle Smith, Edward R. Johnston, Chicago, Ill., for appellant.

Harold I. Baynton, Department of Justice, Office of Alien Property, Washington, D. C., Otto Kerner, Jr., U. S. Atty, Chicago, Ill., James L. Morrisson, Geo. B. Searls, James D. Hill, Ralph S. Spritzer, Irwin A. Seibel, Attys., Department of Justice, Washington, D. C., for appellee.

Before DUFFY, FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

The District Court having allowed defendant's motion to dismiss plaintiff's complaint, plaintiff appeals. Consequently, our only question is whether, by the averments of the complaint, a good and sufficient cause of action was presented.

The averments are in substance as follows: Plaintiff, a native of Japan, is a permanent resident of the United States, and has resided within this country for a period in excess of seven consecutive years following 1915, when she first entered, and has never relinquished that residence. She is married to Shinsaku Nagano, likewise a native of Japan, who immigrated to the United States as a permanent resident in the year 1906 and whose permanent residence, both legally and physically, has continued at all times in Chicago, Illinois. Plaintiff has been but temporarily in Japan, without intending at any time to abandon or relinquish her permanent residence in the United States. She is not an enemy or an ally of an enemy or a national of a designated enemy country within the meaning of the Trading with the Enemy Act, 50 U.S.C.A.Appendix § 1 et seq.

The suit is brought against the Attorney General as successor to the Alien Property Custodian for the purpose of establishing plaintiff's ownership in certain shares of stock of The Fuji Trading Company, which have been taken over by the Custodian on the ground that plaintiff is a national of Japan, a designated enemy country.

The Fuji Trading Company is an Illinois corporation having its principal place of business in Chicago, and is engaged in the manufacture and sale of certain oriental food products. The enterprise was founded in 1910 by plaintiff's husband and has been carried on since that date under his sole management and direction. It is a leading company within the United States in terms of volume and reputation of product as compared with others engaged in the same line of business. The corporation was organized in 1912, and since that time, the husband has been its president and majority stockholder.

Prior to January 3, 1932, the total capital stock of the company consisted of 10,000 shares of common stock, ownership of which was as follows: Shinsaku Nagano, 6210 shares, plaintiff, 3780 shares, and the brother of plaintiff, one Miya, 10 shares. On January 3, 1932, the corporation declared a stock dividend of 5000 shares payable to the holders of record in proportion to their then holdings. Notwithstanding the direction of the resolution that the stock be delivered proportionately to the then existing stockholders, a single certificate for 5000 shares was issued in the name of the wife. However, this certificate was retained in the possession of the husband and never actually or constructively delivered to plaintiff, who had, until approximately the time she instituted this suit, no knowledge of the stock dividend or of the issuance of the certificate in her name; such knowledge as she has in this respect has come to her solely through information given her by her attorney.

The averments as to plaintiff's residence in and absence from the United States are as follows: In January, 1914, plaintiff, then residing in Tokyo, married Shinsaku Nagano, then a permanent resident of the United States. Following the birth of a daughter, Masako, in Japan in November, 1914, plaintiff immigrated to the United States in January, 1915, as a permanent resident, leaving her daughter in the care of plaintiff's mother. In 1916, a son, Shigeo, was born to plaintiff and her husband in Chicago. In 1919, plaintiff, her son, and her husband went to Japan on a voyage, having for its purpose the husband's recuperation from a severe attack of influenza which he had sustained during an epidemic occurring that year. While they were in Japan, another daughter, Takako, was born. After completion of their visit, the father, mother and son returned to Chicago, leaving the two daughters in the care of their grandmother. Plaintiff then continued to reside in Chicago with her husband until 1924.

In 1924, the daughter Takako's illness necessitated a visit to Japan by plaintiff and her husband. On this occasion they decided that plaintiff should remain in Japan as long as necessary to provide a Japanese education for the two daughters and for the American-born son, the latter's oriental education being deemed necessary in order to prepare him to take his place in his father's importing business. The daughters remained in Japan largely because of lack of marriage prospects except among their own race; they finished their education and reached marriageable ages in 1932 and in 1937. In Japan such marriages are arranged for by the parents and a friend acting as intermediary, who is called a matchmaker. The presence of the parent with the daughter is indispensable. Contrary to the hopes of the father and mother, the anticipated marriages could not be arranged because so many of the young men were away in the army. This was at a time when Japan was engaged in military activities in Manchukuo. Finally, in 1941, Takako's marriage was arranged, but Masako is still unmarried and is past the age ordinarily acceptable for marriage. The United States

Immigration Act of 1924, 8 U.S.C.A. § 145 et seq., removed any right to bring the daughters to the United States during the years in which plaintiff was obliged to remain in Japan.

During all this period the husband remained physically present in and a permanent resident of the United States at Chicago. Plaintiff has at all times considered her home to be with her husband in Chicago, and has consistently retained her constant intention to return to her husband and her American residence at the earliest date possible. In the meantime, plaintiff's husband has visited her in Japan every year since her departure from the United States in the year 1924, save only for the years 1932 and 1933, during which she was in the United States, and save also for the war years, commencing in 1942. Plaintiff has at all times remained loyal to the United States and has not engaged in trade with Japan or participated in the Japanese war effort with Japan. During the war she was inactive and lived with her unmarried daughter in their cottage in Shizuoka. Her absence, because of these circumstances, she avers was only temporary and involuntary, occasioned by family obligations and not for the purpose of trading with Japan or for the purpose of residing in Japan.

In addition to the averments mentioned, the record contains an order of the Immigration and Naturalization Service of the Department of Justice, August 11, 1950, in which the Assistant Commissioner, Adjudications Division, held that there was ample evidence of record to support the conclusion reached by the Board of Special Inquiry and the American Consular Service that plaintiff was then returning to America from a temporary visit abroad; that she had never voluntarily relinquished her domicile in the United States and that she was entitled to enter this country "as a returning resident."

The District Court held as a matter of law that the facts averred were sufficient to bring her within the definition of an enemy contained in Section 2 of the Trading with the Enemy Act; that her long stay in Japan was such as to make of her a "resident within" the territory of an enemy nation,

regardless of the possibility that her domicile remained at all times in the United States where her husband had his domicile. The court was of the opinion that the alleged family necessity relied on by plaintiff as justification for her long stay in Japan, was not sufficient to exempt her from the correct connotation of the word "enemy." Accordingly, it decided that a valid cause of action was not stated.

The court considered also Section 12 of the War Claims Act of 1948 (Public Law 896, 80th Congress, 2nd Sess.) which amended the Trading with the Enemy Act by adding thereto Section 39, which, defendant claims, prevents recovery by plaintiff because she is a national of Japan. However, it did not consider this section relevant to a case brought under Section 9(a) of the Act and held that the suit must fall, under the provisions of Section 9(a), because she was an enemy, but not because of the provisions of the new Section 39.

Upon appeal, plaintiff urges that the court erred in finding that, under the averments of the complaint, plaintiff is an enemy within the meaning of the Trading with the Enemy Act so that she may not maintain an action under Section 9(a) of the Trading with the Enemy Act, to recover her property vested by the Alien Property Custodian.

The Government contends that the court rightfully held that plaintiff was barred from bringing her action and renews its contention that, under Section 39, plaintiff is absolutely barred from maintaining any action as a citizen of Japan.

Section 2 of the Trading with the Enemy Act of 1917, as amended, U.S.C.A. Title 50 Appendix, defines "enemy" as: "Any individual * * * of any nationality, resident within the territory * * * of any nation with which the United States is at war * * *." Section 7(c) provides for the seizure of enemy property belonging to or held for the benefit of an enemy, by the Alien Property Custodian; Section 9(a) that "Any person not an enemy * * * claiming any interest, * * * in any money or other property which may have been * * * seized by" the Custodian "* * * may file * * * a notice of his claim" and, if this is denied, "institute a suit * * * in the district court * * * to establish the interest, * * * so claimed," and if the claim is substantiated "the court shall order the * * * delivery to said claimant of * * * property so held." In pursuance of these pertinent statutes, plaintiff based her suit on her averments that she was a permanent resident of Chicago and, therefore, though an alien, not an enemy within the definition contained in Section 2; that she had never, since her marriage to an American resident, resided within Japan within the meaning of the Act and that, therefore, under Section 9(a) she was entitled to recover her assets taken over by the Custodian.

Whether the District Court rightfully held that she was an alien enemy within the meaning of the Act and, therefore, unable to maintain her suit, must be determined, of course, from the averments of her complaint, admitted by the defendant by his motion to dismiss. Essentially these are that, following her marriage, plaintiff entered the United States by permission of the government as a permanent resident and remained there as such until 1924; that after her visits to Japan in the intervening years, in each instance, she returned and was again admitted as a resident of the United States; that, upon the occasion of her last visit to Japan, she and her husband decided that she should remain in that country for the purpose of educating their daughters and getting them married and educating their son, preparatory to his participation in his father's business of importation of oriental food products; that, under Japan's traditional customs and laws, the marriage of the daughters was a matter of contract, involving the intervention of a "matchmaker" and requiring the presence of a parent; that, in pursuance of her stay, one daughter was married and that she was still living with the other in a cottage when the war with Japan intervened; that, after 1924, it was impossible, under the laws of the United States to obtain entry of the two girls to America; that it was practically impossible to find

husbands for them except amongst members of their own race; that her stay in Japan was necessitated and imposed upon her by her family obligations and her parental duties; that at all times she intended to return to her home in Chicago to live there permanently with her husband; that she never abandoned her residence there and had no intention of abandoning the same or of changing it to any other place. Obviously, after the war intervened, it was impossible for her to leave Japan in fulfilment of this intention, and during that period, at least, she was under compulsory constraint in the legal sense of the word. After the war she did return to Chicago as a resident of the United States, being permitted to do so by the Immigration Bureau.

▆▆ Residence being mostly a matter of intention, from the facts averred, it is clear that plaintiff never intended to change her established Chicago residence. The fact that she went to Japan in an attempt to discharge her parental duties does not negate the fact that her permanent residence was in Chicago and that her stay in Japan was for a limited period of time entailed by her praiseworthy sense of family obligation. Permanent residence does not arise out of a transitory abode or out of a temporary sojourn in a place other than that of residence. We think the averments of fact here such that it can only be said that on the face of the complaint she was at all times a permanent resident of the City of Chicago; that she never abandoned that residence and that, as such a resident of the United States, though an alien and at that time incapable of becoming naturalized, she was never within the definition of an enemy,—a "resident within" enemy territory. In McGrath v. Zander, 85 U.S. App.D.C. 334, 177 F.2d 649, 652, the Court of Appeals for the District of Columbia considered a similar situation with this conclusion: "The crucial term 'resident within' has been interpreted in Josephberg v. Markham, 2 Cir., 1945, 152 F.2d 644, 648–649; Vowinckel v. First Federal Trust Co., supra [9 Cir.], 10 F.2d [19] at pages 20, 21; Stadtmuller v. Miller, supra [2 Cir.], 11 F.2d [732] at pages 737–739, 45 A.L.R.

895, and Sarthou v. Clark, D.C.S.D.Cal. 1948, 78 F.Supp. 139, 142. This last case epitomizes the several rulings in these words: ' * * * "resident within the territory" as employed in the Act connotes something different from and more than living within the specified areas. It is rather indicative of a settled and permanent place of abode, volitionally acquired and voluntarily assumed. It is a habitation having domiciliary properties.'" We agree with what was said by that court and with the other decisions cited and conclude that there is nothing in the averments of fact justifying a conclusion of fact that plaintiff was "resident within" Japan.

However, this conclusion is not entirely decisive of the questioned correctness of the judgment of the District Court. Upon the outbreak of the war in 1941, Congress by the First War Powers Act, immediately granted power to the President to vest the property of alien "nationals." However, it did not repeal Sections 2 and 9(a). As a consequence, the vesting power of the President was extended to the property of nationals but the right to sue for return, Section 9(a), still ran to nonenemies. This situation was considered by the Supreme Court in Clark v. Uebersee Finanz-Korporation, A.G., 332 U.S. 480, 68 S.Ct. 174, 176, 92 L.Ed. 88. After commenting that Section 5(b) of the Act of 1941 granted the President the power to vest any property of any foreign country or national thereof, the court continued: "While the scope of the President's power was broadened, there was no amendment restricting the scope of § 9(a). As we have noted, § 9(a) granted 'any person not an enemy or ally of enemy,' claiming an interest in property seized, the right to reclaim it. So the provision reads today. * * * The 1941 amendment to § 5(b) reflected a complete reversal in that policy. The power of seizure and vesting was extended to all property of any foreign country or national so that no innocent appearing device could become a Trojan horse. Congress did not, however, alter the definitions of enemy or of ally of enemy contained in § 2. They remain the same as they were at the time Behn, Meyer & Co.

v. Miller [266 U.S. 457, 45 S.Ct. 165, 69 L.Ed. 374] was decided. * * * Though neither § 2 nor § 9(a) was amended with § 5(b) in 1941, one of them must be read differently after than before that event. * * * We believe a more harmonious reading of § 2, § 5(b) and § 9(a) is had if the concept of enemy or ally of enemy is given a scope which helps the amendment of 1941 fulfill its mission and which does not make § 9(a) for the first time in its history and contrary to the normal connotation of its terms stand as a barrier to the recovery of property by foreign interests which have no possible connection with the enemy." In short, Section 5(b) as amended 1941, extended the power of seizure but it did not purport to limit the right of nonenemies to recover under Section 9(a).

Up to this point we find nothing to impede plaintiff's action, but on July 3, 1948 Congress enacted an amendment which added Section 39, which provides that no property of "any national" of Japan vested in or transferred to an officer or agent of the government pursuant to the provisions of the Act shall be returned to the former owners and that the United States shall not pay compensation for such property or interest therein. The word "national" had been defined in Executive Order No. 8389, April 10, 1940, 5 F.R. 1400, as amended, 12 U.S.C.A. § 95a note, as follows: "Any person who has been domiciled in, or a subject, citizen or resident of a foreign country at any time on or since the effective date of this Order". This definition was reaffirmed in Executive Order No. 9193, July 6, 1942, 7 F.R. 5205, 50 U.S.C.A. Appendix § 6 note. The First War Powers Act, 1941, Title III, c. 593, 55 Stat. 838, 840, Section 302, 50 U.S.C.A. Appendix, § 617, provided that all orders promulgated by the President heretofore under the Trading with the Enemy Act, as amended, which would have been authorized if the provisions of the Act and the amendments made by it had been in effect, are "hereby approved, ratified, and confirmed." Therefore, by act of Congress, the word "national" as defined in the Executive orders approved by Congress, includes any person who is a citizen of a foreign country. Thus, if Section 39 is to be taken at its literal face value, it is the law that a citizen of Japan is a national of that nation and that as such plaintiff may not recover her property even though Section 9(a) giving her right of action has not been expressly repealed. Such, says the government, is the situation here.

The District Court was of the opinion that Section 39 was not intended to repeal Section 9(a). It concluded that the amendment which added Section 39 and certain other sections was dealing with an entirely different purpose, namely, that of creating a special fund of properties seized by the Custodian to be maintained by the government in a special account and to be expended by it in accord with certain expressed purposes and that it was not the intention of Congress in the enactment of the amendment to deprive nonenemy residents of the United States of their existing right to recover property owned by them and mistakenly seized by the Custodian.

We are not at all concerned with those parts of the legislation of Congress which empower the President through his designated agents, to take certain property. It is beyond question that in time of war the Executive should be and has been authorized to seize property whenever it is suspected that it may be enemy property, but Congress, though recognizing the necessity of the broadest power in this respect in the Executive, has at all times evinced an intent not to keep from loyal residents, whether alien or citizen, nonenemy property which is rightfully in America, has served no enemy purpose and has threatened to serve none. Such was the administrative policy expressed by the Custodian in his presentation to the Congressional Committee, where he said that on occasion he had found it necessary to vest property which he later discovered he was not entitled to keep. He proceeded thus, he reported, because he considered it ncessary to resolve all questions of jeopardy against the United States in favor of the government; if he had a strong suspicion that certain property was enemy property it was his conscientious duty to vest it. He

added that subsequent investigations might indicate that he had been mistaken and, in such case, the property should be returned. The Supreme Court approved this practical solution of the problems involved in Becker Steel Co. v. Cummings, 296 U.S. 74 at page 79, 56 S.Ct. 15, at page 18, 80 L.Ed. 54, where it said: "Section 7 of the Trading with the Enemy Act conferred on the Alien Property Custodian authority summarily to seize property upon his determination that it was enemy owned, and such a seizure was lawful even though the determination were erroneous. Central Union Trust Co. v. Garvan, 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403; Stoehr v. Wallace, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604; Commercial Trust Co. of New Jersey v. Miller, 262 U.S. 51, 43 S.Ct. 486, 67 L.Ed. 858. But in thus authorizing the seizure of property as a war measure Congress did not attempt the confiscation of the property of citizens or alien friends." This same thought is expressed in Central Trust Co. v. Garvan, 254 U.S. 554, 566, 41 S.Ct. 214, 215, 65 L.Ed. 403, as follows: "There can be no doubt that Congress has power to provide for an immediate seizure in war times of property supposed to belong to the enemy, * * * if adequate provision is made for a return in case of mistake." As said in Lamar v. Browne, 92 U.S. 187, 196, 23 L.Ed. 650, necessarily, the custodian must act upon appearances. It is his official duty to seize and hold, leaving to the owners to make good their claim as against the capture, in the appropriate tribunal established for that purpose. Thus we have developed a clearly defined policy governing the vesting of enemy property and return of innocent property to a nonenemy owner.

Plaintiff is, under the averments of her complaint, the owner of innocent American property, a friendly alien permanent resident of the United States and as such, entitled to constitutional guarantees. Thus, in Silesian-American Corp. v. Clark, 332 U.S. 469, 68 S.Ct. 179, 184, 92 L.Ed. 81, the court said: "The constitution guarantees to friendly aliens the right to just compensation for the requisitioning of their property by the United States. Russian Volunteer Fleet v. United States [282 U.S. 481, 489, 51 S.Ct. 229, 75 L.Ed. 473]. We must assume that the United States will meet its obligations under the Constitution. Consequently, friendly aliens will be compensated for any property taken * * ." This, of course, refers to the guarantees of the Fifth Amendment, Russian Volunteer Fleet v. United States, 282 U.S. 481, 489, 51 S.Ct. 229. We think that the word "friendly" is as applicable to a loyal resident alien, even though of enemy nationality, as it is to one of our own citizens, and this seems to be the conclusion in other cases, such as Stadtmuller v. Miller, 2 Cir., 1926, 11 F.2d 732; Vowinckel v. First Federal Trust Co., 9 Cir., 10 F.2d 19, and Ex parte Kumezo Kawato, 317 U.S. 69, 63 S.Ct. 115, 87 L.Ed. 58. The Supreme Court, itself, said, in Becker Steel Co. v. Cummings, 296 U.S. 74, 79, 56 S.Ct. 18: "The seizure and detention which the statute commands and the denial of any remedy except that afforded by section 9(a) would be of doubtful constitutionality if the remedy given were inadequate to secure to the nonenemy owner either the return of his property or compensation for it." Thus if Section 39 should be interpreted as the Custodian insists it should be, serious doubt would arise as to its constitutionality, for such a construction would effectuate confiscation of the innocent private property of a friendly resident alien without compensation. Furthermore, the United States has consistently bound itself by treaty to accord to alien residents within its jurisdiction the right of access to American courts to that degree of protection for their person and property required by international law and just compensation and due process of law, if their property should be taken. See 11 Stat. 587, 44 Stat. 2132, 2397, 4441, 45 Stat. 2641, 47 Stat. 2135, 48 Stat. 1507, 49 Stat. 2659, including treaties with various foreign nations.

We need no citation of authority to support the proposition that repeals by implication are never favored and that the clearest case possible must be made before an inference may properly be drawn that a later act by implication repeals an

earlier one. By Section 39 and its related sections, Congress was creating a special fund for a special purpose and providing for the disposition of property that it had previously granted the Custodian the right to seize. It was not attempting to pass upon or to deny the rights of a friendly enemy owner or of an alien resident owner to assert his claim but had in mind undoubtedly, from the context of the entire act, the creation of a special account of enemy property seized. As Mr. Justice Douglas said in Clark v. Uebersee Finanz-Korporation, supra, Section 9(a) should be read harmoniously with subsequent legislation. In Uebersee Finanz-Korporation v. Markham, 81 U.S.App.D.C. 284, 158 F.2d 313, 315, affirmed 332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88, the Court of Appeals after concluding that any action provided by the Tucker Act, 28 U.S.C. 250, was forbidden by Section 7(c), 50 U.S.C.A.Appendix, held that to read out of the statutes the remedy created by Section 9(a) was not justified. "In any event," said the court, "to sustain the Custodian's position not only would require a major job of statutory reconstruction, but would also—as to the property of friendly aliens—raise grave doubts as to the constitutionality of the law. And this, of course, it is not permissible to do." Consequently it followed the language of the Supreme Court in Markham v. Cabell, 326 U.S. 404, 66 S.Ct. 193, 196, 90 L.Ed. 165, to the effect that by amending Section 5(a), Congress did not intend to delete Section 9(a), saying: "the normal assumption is that where Congress amends only one section of a law, leaving another untouched, the two were designed to function as parts of an integrated whole."

In this connection it is well to bear in mind that in at least two instances, Congress refused to enact legislation expressly amending or repealing Section 9(a). 14 H. R. 4840, 78th Cong., 2nd Sess. (1944) and H. R. 5089, 79th Cong., 2nd Sess. (1946). H. R. 4840 provided for a suit under Section 9(a) to establish that the claimant was not a foreign country or national thereof as defined in Section 5.(b). If the claimant failed to prove these facts he would have been entitled to sue in the Court of Claims. The bill died in committee. Hearings Before Subcommittee No. 1 of the Committee on the Judiciary on H. R. 4840, 78th Cong., 2nd Sess. (1944). In H. R. 5089, it was proposed by Section 33(a) that "a foreign country or national thereof may not institute, prosecute, or further maintain a suit pursuant to Section 9(a) hereof in respect to any property or interest vested in or transferred to the Alien Property Custodian * * * or the net proceeds thereof," and by Section 33(b) that "notwithstanding the provisions of Section 7(c), such persons shall have the right to bring suit in the Court of Claims." But the House Judiciary Committee did not approve the bill. However, it was reintroduced as H. R. 6890, including again Sec. 33, and passed by the House with amendments with which we are not now concerned. However, the Senate Judiciary Committee deleted it. S. 2378, 79th Cong., 2nd Sess. (1946). The Senate Report explained the omission as designed to eliminate the proposal to cut off the right of a friendly foreign national to sue for and obtain return of his property under Section 9(a), thus retaining in full the "rights under Section 9(a) which friendly foreign nationals together with United States citizens, have had for more than twenty-five years under the Act." Sen. Rep. No. 1839, 79th Cong., 2nd Sess. (1946). The bill as amended was passed by both Houses with some members protesting the deletion of Section 33, 92 Cong. Rec. 10628 (1946). See letter of Secretary Byrnes to Chairman Sumners of the House Judiciary Committee in connection with the hearings on H. R. 5089. Hearings Before Subcommittee No. 1 of the Committee on the Judiciary on H. R. 5089, 79th Cong., 2nd Sess. (1946) and Hearings Before Subcommittee No. 1 on the Judiciary on S. 2378, 79th Cong., 2nd Sess. (1946). Surely, after two determinations not to modify or repeal Section 9(a) by express words, the Congress did not intend to do by implication what it had refused to do by express repeal. In this connection, it is pertinent also to observe that Section 33 was amended July 1, 1948, to fix time limits within which claims under Sections 9 and 32 might be prosecuted.

Section 39 was amended July 3, 1948, with the result, as the government insists, of repealing Section 9. It seems inconceivable that Congress would, on July 1, expressly provide an extension of time within which to file suits under Section 9 and two days later, forbid such suits entirely.

 We think the Congressional intent was, as stated by Judge Campbell in the District Court, to cause all forfeitable enemy property to be placed in a special fund for a special purpose and to keep it there irrecoverably for that special purpose. We think the legislation such and the Congressional history such that it is evident that Congress was not proposing to deprive friendly alien residents of all opportunity to recover untainted American property,—a right recognized for some twenty-five years by express legislation. To impute such an intent to the Congress would result in a conclusion that it intended to deprive resident owners of innocent private property, untainted by enmity, without due process of law.

Our conclusion might well rest upon another basis. Thus, though literally speaking, plaintiff is a citizen of Japan, she is not a citizen within the meaning of the word and its connotation recognized by judicial decisions. We ordinarily think of a citizen as one who owes allegiance to a state and has a reciprocal right to protection by it. It is obvious that plaintiff, a loyal American resident, unable to secure citizenship in this country, on the averments of her complaint, owed no allegiance to Japan and had no reciprocal rights to protection by it. Again, our concept of a citizen is one who has the right to exercise all the political and civil privileges extended by his government, yet, under the averments of this complaint, plaintiff had no right to exercise any of the political or civil privileges of Japan. Citizenship conveys the idea of membership in a nation, yet under the averments, we think it can not be said that plaintiff is, in any true sense, a member of the nation of Japan. Though ineligible to citizenship until recently, she was and is a permanent resident, owning untainted American property. Her position, we believe, is not within the conception of citizenship of a foreign nation which Congress had in mind in defining a national.

We conclude that the judgment should be reversed and the cause remanded with directions to vacate the order dismissing the complaint and permit the suit to proceed.

Plaintiff insists that in case of reversal this court should enter judgment in favor of plaintiff. To do so would be beyond the limitations of our legitimate functions, for defendant has a right to controvert the averments of the complaint and to have a trial upon the merits. We decide merely that plaintiff has stated a good cause of action and that no act of Congress has taken it away.

The judgment is reversed and remanded with directions as aforesaid.