Herbert BROWNELL, Jr., Attorney General of the United States, as Successor to the Alien Property Custodian, Plaintiff,

v.

SCHERING CORPORATION, Defendant.

Civ. A. No. 1168-52.

United States District Court, D. New Jersey.

March 21, 1955.

Raymond Del Tufo, Jr., U. S. Atty., Newark, David Schwartz, Sp. Asst. to the Atty. Gen., for plaintiff.

Milton, McNulty & Augelli, by John Milton, Jersey City, N. J., White & Case, Joseph M. Hartfield and J. Adam Murphy, New York City (Irving Jurow, Bloomfield, N. J., and Raoul Berger, Washington, D. C., of counsel), for defendant.

HARTSHORNE, District Judge.

The prime issue here is whether plaintiff's Directive and the written instrument, which was signed in January 1952 by defendant Schering Corporation ("Schering") and by the then Assistant Attorney General as Director of the Office of Alien Property ("Alien Property Custodian"), are lawful and binding. The above instruments, in addition to other matters here immaterial, (1) transfer to the Alien Property Custodian, subject to a license to Schering, a series of patents owned by Schering as of April 18, 1942, as listed in Schedule A attached to such signed agreement, such patents to be administered accordingly for the benefit of this Government and United States citizens generally, and (2) similarly make a series of patents, and applications therefor, acquired or developed by Schering after April 18, 1942, available for licensing to all applicants, qualified under the London Patent Accord, on a non-discriminatory, non-exclusive, reasonable royalty basis, such royalty to be determined by arbitration. These instruments were executed, to the knowledge of both parties, as part of a plan whereby such patents were to be held for the benefit of this Government and the public generally, but whereby the balance of the property of Schering, as represented by its common stock, was thereafter to be sold by the Alien Property Custodian to private investment houses as underwriters, and thereafter sold by them to the public. Some time previously the Alien Property Custodian had vested all Schering's outstanding corporate stock, under the Trading With the Enemy Act,[1] as the property of German citizens. A written prospectus was prepared, printed and distributed, referring to the above facts, and warning of their possible effect on the value of the stock to be sold, as a "registration statement", as required by the Securities and Exchange Commission. This registration statement was known to Schering and the underwriters, the purchasers of the stock from the Alien Property Custodian. The Schering stock was thereafter purchased by these underwriters, who thereafter sold their shares to the public under such registration statement and prospectus at prices running into the millions.

Such is the briefest factual background as to the above prime issue in this case, as stipulated by the parties for the purposes of this motion, F.R.C.P. 12(b), 56

1. 50 U.S.C.A.Appendix, § 1.

(c), 28 U.S.C., the parties expressly stipulating "that the motion may be decided by the Court and that there is no issue of fact requiring trial." This issue is raised before this Court by the plaintiff Attorney General's motion as Alien Property Custodian to strike defendant Schering's counterclaim for failure to state a claim upon which relief can be granted, F.R.C.P. 12. This counterclaim asks the rescission of the above instruments, and the return to Schering of the above patents and other rights transferred as above. Schering asserts as grounds for its counterclaim that the instruments are "contrary to law, illegal and unenforceable", and that the one it signed was executed by Schering under compulsion of the Alien Property Custodian. Such compulsion is alleged to be unlawful, since it is claimed to have been beyond the powers of the Alien Property Custodian, and carried out in violation of his powers.

The Alien Property Custodian admits the compulsion in fact, but insists that such compulsion was lawful. But this prime issue as to the binding effect of the above Directive and signed instrument raises a series of subordinate issues, all treated at length in no less than thirteen briefs filed seriatim by the two parties.

The purpose of the above instruments, in opening up the above patents to qualified members of the public, subject to the needs of the Government itself, is admitted by Schering to be in accord with the settled policy of the Government for the benefit of this country and its citizens, and thus to be valid. But while Schering admits that the United States Government had the right to effectuate this purpose as to the so-called "old patents", i. e., those issued to it before January 1, 1947, the date referred to in the Joint Congressional Resolution ending the state of hostilities between the United States and Germany, adopted October 19, 1951,[2] it denies that the means taken therefor were valid and effectual. Further, Schering denies that the President, and his admitted delegee in this respect—the Attorney General, acting as the Alien Property Custodian— had the right to apply this otherwise lawful purpose, by any method whatever, to the patents and applications effective after January 1, 1947—the so-called "new patents"—because of the terms of such Joint Congressional Resolution. This raises another issue of law, specifically as to the legal effect of such Resolution. As to the illegality of the method used by the Alien Property Custodian for such purposes Schering claims that it violated the corporation law of New Jersey, where defendant Schering was incorporated, in that the admitted compulsion of the Alien Property Custodian upon Schering's directors, in forcing them to execute the resolution authorizing and directing Schering's President to execute the agreement, deprived these directors of their freedom of judgment, ordinarily requisite under

2. Such resolution reads as follows:

"*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the state of war declared to exist between the United States and the Government of Germany by the joint resolution of Congress approved December 11, 1941, is hereby terminated and such termination shall take effect on the date of enactment of this resolution: *Provided, however,* That notwithstanding this resolution and any proclamation issued by the President pursuant thereto, any property or interest which prior to January 1, 1947, was subject to vesting or seizure under the provisions of the Trading With the Enemy Act of October 6, 1917 (40 Stat. 411), as amended, or which has heretofore been vested or seized under that Act, including accruals to or proceeds of any such property or interest, shall continue to be subject to the provisions of that Act in the same manner and to the same extent as if this resolution had not been adopted and such proclamation had not been issued. Nothing herein and nothing in such proclamation shall alter the status, as it existed immediately prior hereto, under that Act, of Germany or of any person with respect to any such property or interest." Public Law 181, 82nd Cong., 65 Stat. 451.

State law. The Alien Property Custodian, on the other hand, contends this compulsion was lawful, since he claims (1) corporate directors, where no rights of creditors are involved, are under a duty to follow the instructions of the sole stockholder, here the Alien Property Custodian, and (2) the Trading With the Enemy Act being Federal, controls, and gives him that power, even if the State corporation law did not. Specifically, the Alien Property Custodian says (1) The Trading With the Enemy Act authorized him to have both the "old" and the "new" patents used for the benefit of the United States Government and its citizens, (2) the Alien Property Custodian Directive [3] makes

---

3.

Department of Justice
Office of Alien Property
Washington 25, D.C.
Jan 5 1952

Schering Corporation
2 Broad Street
Bloomfield, New Jersey
and
Board of Directors, collectively and individually,
Schering Corporation
2 Broad Street
Bloomfield, New Jersey
Gentlemen:

By virtue of Vesting Orders Nos. 4, 139, and 3328, and Executive Order 9788, there is now vested in the Attorney General of the United States all of the authorized and outstanding shares of stock of Schering Corporation, a New Jersey Corporation, consisting of 440,000 shares of common stock. Schering Corporation is subject to the supervision, jurisdiction and control of the Attorney General under the authority of the Trading with the Enemy Act, as amended.

By virtue of Vesting Order No. 68 and Executive Order 9788, there is vested in the Attorney General the patents listed in Schedule 1 of Exhibit A of the form of Agreement, attached hereto and made a part hereof (hereinafter referred to as "the attached Agreement").

By virtue of Vesting Order 9704, there is vested in the Attorney General certain interests and rights in certain agreements (more fully identified and described in said Vesting Order) between Schering Corporation and Schering A. G. of Berlin, Germany, relating, among other things, to the patents and the patent application listed in Exhibit A of the attached Agreement.

By virtue of Vesting Order 18685, executed January 5, 1952, there is vested in the Attorney General, among other things, all right, title and interest of Schering A. G. of Berlin, Germany, in and to the patents and patent applications listed in Schedules 2 and 3 of said Exhibit A.

The patents and patent application listed in said Schedules 2 and 3 of Exhibit A, as well as the patents and patent applications listed in Exhibit B of the attached Agreement, presently stand of record in the name of, or have been duly assigned to, Schering Corporation.

In the exercise of the authority and functions vested in or delegated to the Attorney General under the Trading with the Enemy Act, as amended, and in the administration of the property and interests vested in him as aforesaid, the Attorney General, after investigation, has determined it to be in the interest of and for the benefit of the United States that (1) the patents and patent application listed in said Exhibit A be transferred to, or retained by, the Attorney General to be administered in accordance with policies or procedures generally applicable to other patents held by him pursuant to the Trading with the Enemy Act, and (2) the patents listed in Schedule 1 of said Exhibit B and any patents hereafter issued on the patent applications listed in Schedule 2 of said Exhibit B be made available by Schering for licensing to qualified applicants on a non-discriminatory, non-exclusive, reasonable-royalty basis.

It is hereby determined that the aforesaid determination may appropriately be accomplished by the execution and performance of an Agreement, substantially in the form of the attached Agreement, by Schering Corporation and the Attorney General.

Therefore, Schering Corporation is hereby authorized, instructed and directed to execute an agreement with the Attorney General substantially in the form of the attached Agreement; and the Board of Directors of Schering Corporation (collectively and individually) is hereby authorized, instructed, and directed to take such action as may be necessary or proper to authorize and direct the appropriate executive officers of Schering Corporation to execute such an agreement with the Attorney General.

The authorization, instruction and direction contained herein is issued under the authority of the Trading with the Enemy Act, as amended, Executive Order

this "determination", and this "determination" is to be "accomplished" by Schering's "execution and performance of an agreement" to that effect, (3) that Schering obeyed this Directive by having its directors pass a resolution for its President to sign that agreement, and that he did so, (4) that Schering must carry out this Directive and agreement. In turn, Schering denies that the Alien Property Custodian's power under the Trading With the Enemy Act was intended to override the above provisions of the State corporation law, so as to validate this command of the Alien Property Custodian. In fact, Schering contends the Trading With the Enemy Act is unconstitutional. Further, Schering contends that such agreement is a nullity in that the Alien Property Custodian did not adopt lawful administrative procedures in exercising his powers in the above regard.

The several issues before the Court are thus solely of law. Since those (1) as to the New Jersey corporation law and (2) the effect of the Trading With the Enemy Act thereon and its validity, cover both the "old" and "new" patents, they will be first discussed, and separately. The third issue as to the effect of the Joint Congressional Resolution terminating hostilities with Germany will be discussed thereafter, since it affects the "new" patents only. Next, certain contractual contentions of the parties will be dealt with. Finally, the situation will be considered from the standpoint of its validity as administrative procedure.

Parenthetically, it will aid in clarifying the issues, if it be noted that no corporate directors or officers of Schering, or any underwriters, or purchasers of Schering stock from them, are parties to this suit. Thus, even if we assume *arguendo* that a director has a legally protectable right under New Jersey corporation law to exercise an independent judgment in opposition to the will of his sole stockholder, this right exists either (a) for the benefit of the director individually, in order to relieve him from liability for ultra vires or grossly negligent acts which he would not personally have authorized, or (b) for the benefit of the corporation. But since the directors are not parties to this suit, we cannot consider their rights to such protection as individuals, but only as the corporation is affected thereby. Not only so, but the Trading With the Enemy Act itself expressly exculpates them from any civil liability caused by their acts, in compliance with a directive of the Alien Property Custodian,[4] admittedly the case here. Nor are the rights of the underwriters, or of the members of the public who purchased the Schering stock from them, to be considered as directly

9193, as amended, Executive Order 9788, and Department of Justice Order No. 3732, Supp. 51, dated July 12, 1951 (16 Fed.Reg. 6895, July 18, 1951), and pursuant to law. This Directive shall be deemed to be, and any action taken in compliance with the aforesaid authorization, instruction, and direction shall be deemed to have been taken pursuant to an "instruction" and "direction" issued under Section 5(b) of the Trading with the Enemy Act, as amended, which provides in part that

"No person shall be held liable in any court for or in respect to anything done or omitted in good faith in connection with the administration of, or in pursuance of and in reliance on, this subdivision, or any rule, regulation, instruction, or direction issued hereunder."

Please acknowledge receipt hereof in the space provided below and return the carbon copy to this Office.

> Very truly yours,
> For the Attorney General
> (signed) Harold I. Baynton
> Harold I. Baynton
> Assistant Attorney General
> Director, Office of
> Alien Property

Received by:
Schering Corporation
by:
(signed) Irving H. Jurow
(Title) Counsel
Date January 8, 1952.

4. 50 U.S.C.A.Appendix, § 5(b).

involved here, since (1) they are not parties, (2) the underwriters were clearly on notice through the registration statement and prospectus, of the agreement before they purchased their stock, and (3) the purchasers from them are but assignees, privy to the underwriters in such regard, whose rights can rise no higher than their source, irrespective of notice to these purchasers themselves, through the registration statement and prospectus itself.

It should further be noted that Schering substantially admits that the purpose the Alien Property Custodian sought to achieve was valid, in having the above instruments executed, so as to give the benefit of the above patents, to this Government and the general public. Further, Schering admitted on the argument that the action of the Alien Property Custodian would have been unassailable, had he, in order to achieve this valid purpose, done so either (1) by liquidating Schering, taking its assets, and then handling them himself as outlined in the directive and the agreement, or (2) by electing a new board of directors, who would have willingly carried out his will, by executing the very corporate resolution and agreement now questioned.

In the last analysis, then, Schering's objection is that, though the purpose of the Alien Property Custodian was lawful, and though this purpose was carried out in corporate form, this action should be nullified by this Court, because the directors were not permitted by him, the sole corporate stockholder, to refuse to do, what the sole corporate stockholder wanted done. And this is claimed to follow in the absence of all rights of creditors, and despite the fact that Schering admits that it could not object, had the Alien Property Custodian, as sole stockholder, used other methods to achieve the same lawful purpose. Further, this claim of Schering is quite without regard to the effect of the Trading With the Enemy Act, which the Alien Property Custodian claims, and Schering denies, authorized him specifically to force Schering to do what he wanted in the national interest. It is also without regard to the further question as to the effect of the above Joint Congressional Resolution on the Custodian's power to control the so-called new patents under the above directive and agreement.

### The New Jersey Corporation Law

We turn to the first question, i. e., the right of the corporation to nullify its corporate act, because its corporate directors were compelled to comply with the will of its sole stockholder. Admittedly, however, these directors had three alternatives: (1) to sign, (2) to resign, (3) to be removed for failure to do either. Considering this without regard to the effect thereon of the Trading With the Enemy Act, we are faced with a question of New Jersey corporation law.

But the principle is there settled that in the absence of the rights of third parties such as creditors—the situation here—it is the obligation of the directors, as corporate officers, and of the corporation, to do what the sole stockholder asks them to do. In Whitfield v. Kern, E. & A.1937, 122 N.J.Eq. 332, at pages 340, 347, 192 A. 48, at pages 53, 56, in an opinion dealing at length with New Jersey corporation law, the highest State Court says:

"At common law, and by the modern current of authority in this country and in England, the directors of a private corporation, while not regarded as trustees in the strict, technical sense (for title to the corporate property is in the corporation itself and not in its directors), are considered in equity as bearing a fiduciary relation to the corporation and its stockholders. * * * They are quasi trustees for the stockholders at least until insolvency occurs. The latter alone comprise the cestuis que trust. * * * the directors are trustees for the stockholders."

Furthermore, the Federal Court of Appeals for the Third Circuit itself has

recognized the fact that the corporate law of both New Jersey and Pennsylvania gives the sole stockholder of a corporation the power to compel it to do his will. In Renault v. L. N. Renault & Sons, 3 Cir., 1951, 188 F.2d 317, at page 320, the Court says:

"Where one man completely controls a corporation * * * the one man achieving unrestrained control is held prima facie to have power to do all acts which the Board of Directors could have authorized * * *."

A case further illustrating this principle is Fidelity Union Trust Co. v. Vander Roest, Ch.1933, 113 N.J.Eq. 368, 166 A. 918, 921. There deceased was the sole stockholder of a corporation which held title to certain property. This property deceased inadvertently willed, as his own, to his son. The Court nevertheless held it was the duty of the corporation to do what its sole stockholder, the testator, wanted, saying:

"It (the corporation) has not only the power to comply, but it is its obligation to adjust itself to meet the plainly given directives of its creator. Let it (the trustee) dissolve the corporation and as trustees convey, or have the corporation resolve to convey, if that be more convenient."

In the case at bar the corporation has "resolved to convey". Nay more, it has executed a formal instrument through its President, to carry out this resolution. The Alien Property Custodian has thus complied with the requirements of corporate form. It only remains necessary for the corporation to comply with the directive of its sole stockholder, and obey the command of such stockholder, to which it has already acceded in writing. Schering has, though unwillingly, done just what it should have done. No court will aid it to undo what it has done, and should have done, simply in order to compel it to comply with that obligation all over again. Nor are Jackson v. Hooper, E. & A.1910, 76 N.J.Eq. 592, 75 A. 568, 27 L.R.A.,N.S., 658,

Hackensack Trust Co. v. City of Hackensack, 116 N.J.L. 343, 184 A. 408 (Sup. Ct.1936), and certain other cases cited by Schering, to the contrary. These all point to the well settled distinction between a corporation and its stockholders, which no one questions, but none of them deal with the right of a one-man stockholder to control corporate action, in corporate form, and in the absence of the rights of third parties such as creditors, which is the question here. In addition, Whitfield was decided by the highest New Jersey court after Jackson, and thus controls. Indeed, long prior to Jackson, and after it, as well, it had been the law in New Jersey that

"When the rights of the state, the public, and creditors are eliminated (as in the case at bar), and only the rights of stockholders are involved, the form of the fictional body termed a corporation does not hamper the court in the least in dealing with the rights of the parties. And that which the individuals composing the corporation might do, and will be held to have done among themselves, will be dealt with without regard to the immaterial fact they were members of a fictional body." (Parenthesis this Court's). Perkins v. Trinity Realty Co., 1904, 69 N.J.Eq. 723, 731, 61 A. 167, 170, affirmed 71 N.J.Eq. 304, 71 A. 1135.

To the same effect are Breslin v. Fries-Breslin Co., E. & A.1903, 70 N.J.L. 274, 282, 58 A. 313; Feld v. Joseph Feld & Co., E. & A.1940, 126 N.J.L. 153, 18 A.2d 26; Murtland Holding Co. v. Egg Harbor Commercial Bank, Ch.1938, 123 N.J.Eq. 117, 196 A. 230; Computing Scale Co. v. Toledo Computing Scale Co., 7 Cir., 1921, 279 F. 648, 674, certiorari denied 257 U.S. 657, 42 S.Ct. 184, 66 L.Ed. 420. In the latter case the Court says:

"An assignment (of a patent) in the name of and on behalf of a corporation by all of its stockholders would convey at least a full equitable title."

The legal philosophy can be briefly stated which underlies this application of the doctrine of "piercing the corporate veil", where no rights of creditors are involved, but simply intra-corporate rights, particularly where the situation is that of a "one-man corporation." This is that a real person seeks the creation of the artificial person, the corporation, primarily to protect his individual assets from creditors by the separation of these two distinct entities. But the sovereignty, which creates this artificial person, insists that this protection from creditors will be granted the real person, only if he conducts the artificial person separately from the real person and in the artificial way the statutes provide. (Indeed, if the real person seeks to defraud creditors by this artificiality the corporate veil will be pierced for their protection). Hence, whenever the stockholders, the real persons, seek this corporate protection from creditors, they must have complied with the artificial requirements of the statute. But where no such protection from creditors is sought, as in the case at bar, and where, therefore, the essentially separate nature of the corporate entity is not involved, there is no reason why this natural person, owning property, whether legal or equitable, should not be able to control his property just as any other natural person can.[5]

That the above principle, as to piercing the corporate veil with regard to matters concerning only the rights of corporate stockholders and officers *inter sese,* has particular applicability to "one-man cor-

porations", see "One-Man Corporations", 51 Harv.L.Rev., 1373, 1405, which speaks of " * * * 'one man company law', (as) a law within the law of corporations" and adds, on page 1388:

" * * * Where a sole shareholder purports to act in behalf of the company, there is no other person concerned: he acts in his own interest and for himself alone. The justification existing in the ordinary corporation situation for treating the corporation as a separate person, i. e., a principal, is entirely lacking. * * * "

It is thus clear that any sole stockholder of a corporation, in the absence of creditors, as here, has the right to insist on the corporation's doing what he wants. Such being the case, the Alien Property Custodian did what he had a right to do, and in a formal corporate way, in compelling Schering to comply with his Directive, in both the "execution and performance" of the agreement. Thus his compulsion was rightful, not wrongful. If not wrongful, it was not duress. "Acts or threats cannot constitute duress unless they are wrongful * * *." Restatement of Contracts, Sec. 492, comment g. Miller v. Eisele, E. & A.1933, 111 N.J.L. 268, 168 A. 426; Automatic Radio Manufacturing Co. v. Hazeltine Research, 1 Cir., 1949, 176 F.2d 799, 804–805, affirmed 1950, 339 U.S. 827, 834, 70 S.Ct. 894, 94 L.Ed. 1312, rehearing denied 1950, 340 U.S. 846, 71 S.Ct. 13, 95 L.Ed. 620. It therefore follows that when the corporation has formally carried out the wishes of the Alien

---

5. This principle is now being generally recognized as the law throughout the country, as shown in Fletcher's Cyclopedia, Corporations, where such cases are copiously collated. For instance, that learned author there says:

"The corporation may be disregarded as a form or a 'fiction' and the ultimate party regarded in law and fact, when necessary to the justice of the case.

" * * * practically all authorities agree that under some circumstances in a particular case the corporation may be disregarded as an intermediate between the ultimate person or persons or corporation and the adverse party; and *should* be disregarded in the interest of justice in such cases as fraud, contravention of law or contract, public wrong, or *to work out the equities among members of the corporation internally and involving no rights of the public or third persons.* There is a growing tendency of courts to do so." (*Underlining* by the Court.) 1 Fletcher Cyc., Corporations, 1931 Ed., Sec. 41, page 134.

See also 1 ibid., Sec. 46, 5 ibid., 1952 Rev.Ed., Sec. 2099, page 440.

Property Custodian, even though some of its functionaries have done so unwillingly, the courts will not declare void, what has been lawfully and formally done in the corporate manner. In further support of the lawfulness of the Directive of the Alien Property Custodian and its annexed agreement, we turn to the effect thereon of the Trading With the Enemy Act.

### The Trading With the Enemy Act

No time need be wasted on the lawfulness of the action of Congress, under its constitutional war power, in crippling the war-making resources of the enemy by seizing property of its nationals, and this without any constitutional requirement to make compensation to an enemy owner therefor. Though, of course, compensation must be made to citizens for any mistake in seizure of their property. Hence, the validity of the purpose of the Trading With the Enemy Act, with its provisions for the protection of citizens, is beyond question.[6] Under this act the Alien Property Custodian is specifically authorized to treat property acquired by him "as though he were the absolute owner thereof".[7] However, while this act, as originally enacted to meet the needs of this country in World War I, permitted the Government to "prevent" transactions as to enemy property, it did not authorize the Government to "compel the use" of foreign property in the interest of the United States. Thus, in proposing the 1941 amendment to the Trading With the Enemy Act, the Senate Committee on the Judiciary called attention to the fact that "it is now necessary for the Government to be able to affirmatively compel the use and application of foreign property in a manner consistent with the interests of the United States". Such report continued, alluding to the provisions of what is now Section 5(b), as amended, "It gives the President flexible powers, operating through such agency as he might choose, to deal comprehensively with the many problems that surround alien property or its ownership or control in the manner most effective in each particular case. In this respect the bill avoids the rigidity and inflexibility which characterized the Alien Property Custodian law enacted during the last war * * *."[8]

Accordingly, the 1941 amendment greatly broadened the powers of the Alien Property Custodian, as designated by the President, by providing that, among other things, he might "regulate, direct and compel * * * any * * * use, transfer * * * of * * * any property in which any foreign country or a national thereof has any interest."[9] (Italics this Court's.) In this same section it is further provided that "any property or interest of any foreign country or national thereof shall vest * * * and *upon such terms (and conditions as the President may prescribe* such interest or property shall be held, used, administered, * * * or otherwise dealt with in the interest of and for the benefit of the United States * * *." (Italics this Court's.)[10] These

---

6. Act Oct. 6, 1917, chapter 106, 40 Stat. 423; 50 U.S.C.A.Appendix, § 1 et seq.; Halbach v. Markham, D.C.N.J.1952, 106 F.Supp. 475; Cummings v. Deutsche Bank, 1937, 300 U.S. 115, 57 S.Ct. 359, 81 L.Ed. 545; Brownell v. Fidelity Union Trust Co., D.C.N.J.1954, 119 F.Supp. 755.

7. 50 U.S.C.A.Appendix, § 12.

8. S.Rep.No. 911, 77th Cong., 1st Sess., page 2.

9. Trading With the Enemy Act, Title 50 U.S.C.A.Appendix, § 5.

10. The provisions in question read:
"(b) (1) During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

* * * * *

"(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing

are indeed "broad powers", as stated by Judge McLaughlin, of the Third Circuit, specially sitting in Halbach, supra. Not only are these powers stated in broad language, but the terms of the act are to be liberally construed to effectuate their purpose in enabling the Alien Property Custodian to seize the property of any enemy nationals and to devote it to the best interests of the United States. United States v. Chemical Foundation, 1926, 272 U.S. 1, 10, 47 S.Ct. 1, 71 L.Ed. 131.

This broad controlling, vesting and supervisory power was specifically delegated by the President to the Alien Property Custodian's discretion.[11]

■ Schering was German owned originally. The corporation, its stock and its property therefore were "property in which any foreign country or a national thereof has any interest", which the Alien Property Custodian accordingly could vest, control or supervise, as above. Vesting orders covering the Schering stock were issued as soon as the Alien Property Custodian Office was organized in April 1942.[12] In addition, it is stipulated that in fact the Alien Property Custodian took over the supervision of the corporation under the above provisions of the act.

When these orders took effect, the Alien Property Custodian could therefore, by force of the statute, "direct and compel * * * any * * * use [or] transfer" of Schering or its property in any way he found necessary, just as long as this was "in the interest of and for the benefit of the United States". Since Schering admits that it was in the interest and for the benefit of the United States to have Schering's patents used for the benefit of this Government and of its qualified citizenry generally, the lengthy legislative history of our Government to that effect will not be detailed.

Such being the situation, the Alien Property Custodian, after lengthy discussion of the matter with Schering and its officers, decided to carry through the very plan he did carry through, now attacked by Schering. On January 5, 1952 he wrote Schering a directive (see note 3, supra) reciting his stock ownership of Schering, the Schering patents in question, both "old" and "new", and that he

"*has determined* it to be in the interest of and for the benefit of the United States that (1) the (old) patents * * * be transferred to,

---

in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,

by any person, or with respect to any property, subject to the jurisdiction of the United States; and any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States * * *."

Title 50 U.S.C.A.Appendix, § 5.

11. Executive Order No. 9193, paragraph 2(a), July 6, 1942, 50 U.S.C.A.Appendix, § 6 note.

"2. The Alien Property Custodian is authorized and empowered to take such action as he deems necessary in the national interest, including, but not limited to, the power to direct, manage, supervise, control or vest, with respect to:

"(a) any business enterprise within the United States which is a national of a designated enemy country and any property of any nature whatsoever owned or controlled by, payable or deliverable to, held on behalf of or on account of or owing to or which is evidence of ownership or control of any such business enterprise, and any interest of any nature whatsoever in such business enterprise held by an enemy country or national thereof; * * *."

7 Fed.Reg. 5205, amending Executive Order No. 9095, March 11, 1942, 7 Fed.Reg. 1971.

12. Vesting Orders 4, 4139, 3328, 7 Fed. Reg. 2922, 7545, 9 Fed.Reg. 3401.

or retained by the Attorney General (as Alien Property Custodian) *·* * * and (2) the (new) patents * * * (shall) be made available by Schering for licensing to qualified applicants on a non-discriminatory, non-exclusive, reasonable-royalty basis.

"It is hereby determined that *the aforesaid determination may appropriately be accomplished by the execution and performance of an agreement* substantially in the form of the attached agreement, by Schering Corporation and the Attorney General.

"Therefore *Schering* Corporation *is* hereby authorized, instructed and *directed* to execute an agreement with the Attorney General substantially in the form of the attached agreement (the agreement in question) * * *." (Italics and parentheses the Court's)

The Directive further directed the Schering directors to authorize the execution of such agreement, and alluded to the provisions of the statute that they should not be held liable for anything done by them in pursuance of such Directive.

The Schering directors, after some delay, and claiming compulsion, accordingly passed a resolution authorizing the Schering officers to execute the agreement referred to. This agreement was executed by Schering's officers, and is the agreement which Schering now questions, a copy of same being attached to the complaint herein, but not set forth verbatim here, since it covers a literal host of matters here immaterial.

From the statement of the above facts, it would therefore appear that the Alien Property Custodian, with his power to compel any use or transfer of Schering's patents, let alone the rest of its properties not now in question, had become the typical "one-man" of the typical "one-man corporation", with the clear power under the New Jersey corporation law to compel its board of directors to do his will. Since his directive expressly stated that his "determination may appropriately be accomplished by the execution and performance of (the) agreement", in question, in so doing Schering's directors and officers did exactly what they were obligated to do—no more, no less. This they could clearly have been compelled to do under the corporation law of New Jersey by this Court, had they failed to take such formal corporate action. Surely, having done just what they could be legally compelled to do, Schering cannot expect this Court to nullify that which they actually did, under such lawful obligation. Yet this is exactly what Schering asks, when its counterclaim asks rescission of these instruments and return of any properties already transferred thereunder.

■■ In fact, even assuming *arguendo* that the State law as to corporations were not to this effect, it is hornbook law that the Trading With the Enemy Act, passed by the Congress under its war power, and here affecting a corporation whose stock was completely owned by German nationals, without any constitutional right to compensation, is paramount and controlling as regards any State law to the contrary. Specifically, even if, contrary to fact, the State corporation law gave the directors the right to exercise their judgment contrary to the will of their one-man stockholder, it is clear that this right of the directors to disregard the will of their one-man stockholder, here the Alien Property Custodian, would nullify the powers given him under the Trading With the Enemy Act, i. e., nullify the very purposes of the Act. For it is the Alien Property Custodian who must decide how to handle the property vested in him or controlled by him in the interests of the United States. In fact, ever since he vested Schering's stock, the Alien Property Custodian has directed may acts by Schering, right down through the sale of Schering's stock under the directive and the instrument signed to help accomplish its "determination". All these acts were done, not under the independent judgment of

Schering's directors, but through the supervisory and controlling power of the Alien Property Custodian under the act. Clearly no mere corporate directors have any right to frustrate the Custodian's exercise of these lawful statutory powers. Thus, even if Schering is right in its contention as to the State corporation law, this rule must give way as contrary to the clear provisions and intent of the Trading With the Enemy Act.

■ Schering's contention that the Federal law is not inconsistent with the State corporation law, and therefore does not overrule the latter, is correct, but not in the way Schering means. The one is consistent with the other, because the enforcement of the Federal law has made of Schering a one-man corporation, and the State law makes the execution of an agreement by such a one-man corporation lawful under the compulsion of the "one-man", here the Alien Property Custodian. Schering's contention that it was inappropriate and unnecessary for the Alien Property Custodian to use the method he did to achieve his lawful purpose, since he could have lawfully achieved such purpose by cutting off the heads of the directors, instead of simply telling them what to do, is fallacious. For, in the first place, the Alien Property Custodian could "direct and compel *any* use" of Schering he desired. He found the particular method he adopted to be "appropriate". This executive judgment is not to be disregarded lightly. United States v. Chemical Foundation, supra. In the next place, the Chemical

Foundation case itself was a warning to the Alien Property Custodian, as to the difficulties that might arise if he cut off the heads of the directors, by liquidating the corporation and creating a new corporation, rather than, as he did, continuing Schering itself and selling its assets, minus the patents, to the underwriters and the public. Further, had the Custodian cut off the heads of the present directors, by electing new directors, who would sign the agreement in question as he directed, they would have been mere dummies, without that independence of judgment for which Schering contends. Or, had these new directors sought to exercise independent judgment, the Alien Property Custodian would have had to issue once again the very same directive now questioned by Schering. That the Alien Property Custodian's choice of method was not arbitrary, but "appropriate", is thus clear.

■ Schering further contends that the Trading With the Enemy Act is unconstitutional, and so can not override the State corporation law, because it provides no express remedy to test it, save the penal provisions of Section 5(b), which Schering claims are so harsh as to amount to no remedy at all. In support of this contention, so startling as to an act which has withstood all other attacks for so many years, Schering primarily relies on Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 449, 52 L.Ed. 714 (1908). But a consideration of the unusually lengthy opinion in this case shows it does not uphold Schering's contention,[13] but only raises a question, if any,

13. The facts in Ex parte Young were that Minnesota fixed railroad rates by statute. But the statute provided for no court review, and further provided that any one not obeying such rates would be criminally liable, and it imposed "enormous fines and possible imprisonment" as the penalty for such violation. The Minnesota Attorney General threatened the railroad with proceedings in the State Court to enforce the statute. Railroad stockholders filed a bill in equity in the Federal Court to restrain the Minnesota Attorney General from such proceedings in the State Court, claiming the invalidity of the statute. The restraint issued, but the Attorney General instituted the proceedings nevertheless. So the Federal Court held the Attorney General in contempt. Thereupon the Attorney General obtained a habeas corpus writ to review the contempt order, claiming lack of jurisdiction in the Federal Court, i. e., the lack of a Federal question. Such was the situation before the United States Supreme Court. The Supreme Court held (1) that the Federal Court had jurisdiction, because there was a Federal constitutional question involved; (2) the Federal Court was correct in restraining the

as to the penal provisions of the act, which are not here involved. This is because

(1) The major aims of the Trading With the Enemy Act are so important that Congress would have enacted such act, even without these penal provisions. Thus the penal provisions are separable and, even should they be invalid, a conclusion this Court does not even intimate, such provisions fall alone. McFarland v. American Sugar Refining Co., 1916, 241 U.S. 79, 36 S.Ct. 498, 60 L.Ed. 899, 11 A.J., Constitutional Law, Secs. 152, 155.

■■■ (2) The penal provisions in question do not apply to every disobedience of the act, but only to such as are "willful". This term "when used in a criminal statute, it generally means an act done with a bad purpose." Screws v. United States, 1945, 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495. Certainly Schering's filing of the counterclaim in this case, which itself raises this question as to the constitutionality of these penal provisions, can hardly be claimed to have been filed "with a bad purpose", and so to be "willful". Therefore, this very proceeding, which will result in determining whether Schering should, or should not, obey the directive of the Alien Property Custodian, protects Schering from the imposition of any penalty whatever under Section 5(b).

In addition, of course, Schering might well have chosen another remedy—the very remedy of restraint against the United States Attorney General, which was held valid against the State Attorney General in Ex parte Young, or such further "remedy as they might have under the Fifth Amendment". Clark v. Uebersee Finanz-Korp, 1947, 332 U.S. 480, 488, 68 S.Ct. 174, 177, 92 L.Ed. 88.

The other cases cited by Schering in support of its above contention as to the unconstitutionality of Section 5(b) are simply inapplicable. They go to other points, here immaterial, which therefore will not be discussed. Schering's contention that the Trading With the Enemy Act is unconstitutional thus falls to the ground.

### The Joint Congressional Resolution Terminating Hostilities with Germany

■■■ On this question, as to the legal effect of such Resolution on the "new" patents involved in this case, the underlying Congressional purpose is enlightening. The legislative history of the Resolution shows that its purpose was not only to terminate the state of war, but also to provide that the rights of this country with regard to Germany should "remain unchanged by the resolution". Also, "the resolution clearly states that the termination of the state of war shall

---

Attorney General, because Federal constitutional rights had been violated, i. e., the severity of the statutory penalties were such that they furnished no adequate remedy to test the sufficiency of the rates so such provisions denied due process. But the Court (3) did *not* hold the entire statute invalid. On page 148 of 209 U.S., on page 449 of 28 S.Ct., the Court said:

" * * * The provisions of the acts relating to the enforcement of the rates * * * by imposing such enormous fines and possible imprisonment * * * are unconstitutional on their face * * *."

That Ex parte Young did not hold, as Schering claims, that an inadequate statutory remedy invalidates the entire statute, is made doubly clear by the later case of Louisville & N. R. Co. v. Garrett, 1913, 231 U.S. 298, 34 S.Ct. 48, 58 L.Ed.

229, relying on Ex parte Young. Garrett, too, was a rate-fixing case under a State statute. The Court there noted that if the rates were confiscatory a bill in equity would lie, such as that used in Ex parte Young, to give relief. As to the severe penalties provided by the statute for the failure to apply the statutory rates, the Court said, 231 U.S. at page 311, 34 S.Ct. at page 53:

"If it were assumed that these (penalties) would be open to objection as operating to deprive the carrier of a fair opportunity to contest the validity of the commission's action, still, the penal provisions would be separable, and the force of the remaining portion of the statute would not be impaired." (Parentheses this Court's.)

not in any way *alter the program authorized by the Congress under the Trading With the Enemy Act."* (Italics this Court's.) [14] Indeed, it would have been difficult for Congress to have chosen words to express its policy more clearly that the resolution was "not in any way [to] alter the program * * * under the Trading With the Enemy Act." [15] Congress in so many words said

> "that notwithstanding this resolution * * * any property or interest which prior to January 1, 1947, was subject to vesting or seizure under the provisions of the Trading With the Enemy Act * * * or which has heretofore been vested or seized under that Act, including accruals to or proceeds of any such property or interest, shall continue to be subject to the provisions of that Act in the same manner and to the same extent as if this resolution had not been adopted."

In other words, the resolution and the President's proclamation in that regard have no effect whatever as to (1) "any property or interest" which might have been, but was not, subjected to vesting or seizure under the act prior to such date, "including accruals to or proceeds of any such property or interest", or as to (2) "any property or interest" which had been vested or seized under the act, "including accruals to or proceeds of" same. Then, to make assurance doubly sure, the resolution further provided that no person's status prior to the resolution, with respect to any of the property or interests above described, including accruals or proceeds, should be altered by the resolution or proclamation, from what it had been before the resolution. Since Schering is a person, as is the Alien Property Custodian, the status of both parties to this suit was not altered by the resolution, as to any property or interest they had, which had either been vested or seized under the act, or was subject to vesting and seizure thereunder, including any accruals to or proceeds of any such property or interest.

All Schering's stock had been vested prior to the resolution. Thereby, as seen above, the Alien Property Custodian obtained sole control and equitable ownership of Schering. This control and ownership of Schering and its properties continued till the sale of such stock under the directive and signed agreement here being considered. Thus the Alien Property Custodian controlled and equitably owned, not only all Schering's patents and patent applications prior to the date fixed in the resolution—January 1, 1947—but all those taken out and applied for thereafter, down till the sale in 1952. This vesting of all Schering's stock, with the concomitant right in the Alien Property Custodian to "direct and compel * * * any use * * * or dealing in * * *" such stock as he desired in the interest of this country, gave him the right to control Schering's directors and officers and have them, if the Alien Property Costodian deemed it appropriate, turn over all its patents to him. The acts of the Alien Property Custodian as to Schering's patents previous to the Joint Congressional Resolution of 1951 thus either amounted to a "vesting or seizure" as alluded to in such Joint Resolution, or, if not, such patents were "subject to vesting or seizure", as alluded to in such Joint Resolution, under the Alien Property Custodian's powers under the Trading With the Enemy Act. Accordingly, neither the "old" nor the "new" patents were affected by the Joint Resolution according to its express words. This is due to the "complete reversal in that policy" (of the Act), caused by its 1941 amendment.

Originally the policy was "to seize the shares of stock when *enemy* owned rather than to take over the corporate property." Hamburg-American Co. v. United States,

14. S.Rep. 892, 82nd Cong., 1st Sess., pages 2, 4, 6. H.Rep. 706, 82nd Cong., 1st Sess.

15. Public Law 181, 82nd Cong., 65 Stat. 451, U.S.Code Congressional and Administrative News 1951, p. 2358. See footnote 2.

1928, 277 U.S. 138, 140, 48 S.Ct. 470, 471, 72 L.Ed. 822. But "the 1941 amendment to Section 5(b) reflected a complete reversal in that policy." Clark v. Uebersee Finanz-Korp, 1947, 332 U.S. 480, 483, 488, 68 S.Ct. 174, 175, 177, 92 L.Ed. 88. In that case the Court said:

"* * * The scheme of the Act as it was then drawn was 'to seize the shares of stock when enemy owned rather than to take over the corporate property.' Hamburg-American Co. v. United States, 277 U.S. 138, 140, 48 S.Ct. 470, 471, 72 L.Ed. 822. That was at least one respect in which the Act had a 'rigidity and inflexibility' that was sought to be cured by the amendment to § 5(b) in 1941. * * * Congress by that amendment granted the President the power to vest in an agency designated by him 'any property or interest of any foreign country or national thereof.' * * * Thus the President acquired new 'flexible powers' * * *. As we have observed, the scheme of the act when Behn, etc. was decided was to respect the corporate form even though the enemy held all the stock of the corporate claimant. Hamburg-American, etc. The 1941 amendment to Sec. 5(b) reflected a complete reversal in that policy. The power of seizure and vesting was extended to all property of any foreign country or national so that no innocent appearing device could become a Trojan horse. * * *"

Footnote 4 "Sec. 5(b) (1) as amended also granted the President the power to '* * * compel * * * any acquisition * * * of * * * any property in which any foreign country or a national thereof has any interest * * *.'"

Thus the 1941 amendment authorized either the seizure or the vesting of a domestic corporation, as well as a foreign corporation, if any enemy had an interest in it.

■■■■ While, therefore, before the 1941 amendment of Sec. 5(b), Schering, the corporation, and its property, were not subject to the "vesting or seizure" referred to in the Joint Resolution, it is clear that Schering, the corporation, and its property, including not only its patents but its applications therefor, were all subject to vesting or seizure after the 1941 amendment, and long before the Joint Resolution was adopted in 1951. Since both Schering's "old" and its "new" patents were "subject to vesting or seizure" before the Resolution was adopted, they are expressly excepted from the effect of such Resolution and the accompanying Presidential Proclamation. As to them, the situation is the same "as if this resolution had not been adopted and such proclamation had not been issued." Moreover, the status of Schering, as a "corporate" person, as it existed prior to this 1951 Resolution, remains the same today as it was before the enactment of the Joint Resolution and the accompanying Proclamation. This status is, as above, that the entire corporate property of Schering, as of that date, is subject to either vesting or seizure, and therefore same "continued to be subject to the provisions of the Trading With the Enemy Act." In addition to the above, the "property or interest" which remains unaffected by the Joint Resolution also includes "accruals to or proceeds of any such property or interest." These are broad terms indeed, "accruals" referring to anything which is legally added to such interest as it pre-existed, "proceeds" referring to any change of form of such interest. And it is settled law that the Trading With the Enemy Act is to be liberally construed to effectuate its purposes. United States v. Chemical Foundation, supra. As previously noted, a stockholder is considered the equitable owner of the corporate assets. As long as he continues such equitable owner, in him also inheres equitable ownership of all corporate assets acquired or produced by the corporation. Clearly these added assets accrued to him as equitable corporate owner. Thus the sole equitable owner of Schering, the Alien Property

Custodian, equitably owned Schering's corporate assets at the time of vesting, and there accrued to his interests, as such corporate owner, not only all "proceeds" of such assets, but all additional corporate assets which the corporation thereafter acquired or produced, till the day he sold his stock, long after the enactment of the above resolution. In this aspect, also, these so-called "new" patents remain subject to the power of the Alien Property Custodian, entirely unaffected by the Joint Resolution and accompanying Presidential Proclamation.

Clearly, therefore, Schering's contention is incorrect that such Joint Resolution terminated the right of the Alien Property Custodian over such "new" patents.

### The Compulsion by the Alien Property Custodian

Schering further contends that the compulsion on Schering by the Alien Property Custodian to sign the above form agreement renders it invalid. It is admitted by the stipulation entered into on this motion[16] that "The Government exercised compulsion on Schering's directors and officers, including fear of imprisonment, in order to have them execute the paper in question (Exhibit 2 attached to the complaint), in form an agreement, and its authorizing resolution. * * * "

The first part of Schering's argument is that this compulsion constituted duress and that this duress invalidated "the paper in form an agreement". But to this contention there are two answers. The first is, that compulsion never constitutes duress unless such compulsion is wrongful. The correctness of this principle has already been established by the many leading authorities cited supra. And, as has been seen, the above Directive of the Alien Property Custodian which "directed" Schering to execute the agreement in question, and which is therefore the source of the compulsion, is not wrongful at all. It is lawful under New Jersey corporation law. It is lawful, irrespective of New Jersey corporation law, under the constitutional provisions of the Federal Trading With the Enemy Act, all as seen above.

The second answer to defendant's contention as to the alleged duress on them to sign this paper, in form an agreement, is that this compulsion, as above indicated, is not created by the paper signed by Schering, which Schering claims is invalidated thereby, but by the

16. Civil 1168–52
 Stipulation
 Newark, N. J.
 April 15, 1954
 For the purpose of this motion it is agreed:
 (1) The Government exercised compulsion on Schering's directors and officers, including fear of imprisonment, in order to have them execute the paper in question (Exhibit 2 attached to the Complaint), in form an agreement, and its authorizing resolution.
 (2) Schering's officers and directors executed such paper and its authorizing resolution under such compulsion and not voluntarily.
 (3) Schering's officers and directors understood the instruments they executed and the acts called for by such instruments, but they did not execute or authorize the execution of the instruments of their own free will, and in the exercise of their discretion, as such directors and officers. Schering's officers and directors understood that, by executing Exhibit 2 attached to the complaint, Schering would have made promises if it had not been for the compulsion referred to in paragraphs 1 and 2 hereof, which prevented the exercise of the will and discretion of said officers and directors.
 The defendant does not make any contention of fact (as distinguished from contentions of law) that it was not the settled policy of the Government to turn over vested patents to the use of the public.
 (4) It is agreed that the motion may be decided by the Court and that there is no issue of fact requiring trial.
 (5) This stipulation supersedes the stipulation of February 11, 1954.

above Directive. The Directive was the Alien Property Custodian's "determination". It does not purport to be an agreement by Schering. The agreement signed by Schering and its "performance" was merely the means, by which the Alien Property Custodian's "determination may appropriately be accomplished". This Directive is not a contract, which might be affected by duress (if it existed). It is a command, and a command which was lawful under the Trading With the Enemy Act. Obviously, lawful compulsion does not invalidate the lawful command of the Alien Property Custodian which created that lawful compulsion. Nor, by the same token, can it invalidate the soldier's written statement of obedience to that command—the form agreement—, which he stipulates he "understood". This argument of Schering is fallacious.

Schering further contends that the paper it signed is invalid, on the claim that same was a contract, not merely in form, but in fact, i. e., an instrument voluntarily and freely executed by each signatory, for good consideration, and that as to this contract there was no "meeting of the minds". But this contention is directly contra to the stipulation of facts signed by Schering (see note [16] supra). Thereby Schering agreed that it "executed such paper and its authorizing resolution under such compulsion and not voluntarily". Schering further stipulated thereby that its "officers and directors understood the instruments they executed and the acts called for by such instruments * * *." In other words (1) such paper was not in fact, but only in form, a contract. In fact, it was the equivalent of a statement by a soldier that he would obey his General's command; (2) in addition, it definitely showed a "meeting of the minds" of both the General and the soldier as to the terms of this command. Obviously, the soldier's lack of desire to obey the command is immaterial. It was his duty to obey.

Indeed, the authorities Schering cites on this involved argument are quite inapposite, since they deal with misunderstandings between the parties as to the subject matter of the contract, i. e., a misunderstanding between the parties as to whether they were contracting as to a horse or a cow, as to whether the marriage was one in jest or not, and the like. No such situation is here presented. Schering has stipulated that it "understood the instruments (its officers and directors) executed and the acts called for by such instrument." This is quite irrespective of the principle that "the only intent of the parties to a contract which is essential, is an intent to say the words and do the acts which constitute the manifestation of assent." 1 Williston Contracts, Rev.Ed., Sec. 21, page 35. That Schering did so intend is clear from the above stipulation.

Not only so, but the Alien Property Custodian, upon the receipt of this written statement of obedience to the command, thereupon, and in order to effectuate the purpose of the command, to the knowledge of Schering sold all Schering's stock, which the Alien Property Custodian then owned, to third parties, and on express notice in the prospectus both of the command, and of Schering's obligations for "irrevocable" obedience thereto, and of their possible effect upon the value of the stock sold. Such being the case, the plainest elements of estoppel apply, to prevent the soldier who has received the lawful command from his General, and agreed in writing to obey it, from thereafter disobeying it, after his General has given up his rights, in reliance upon such stated irrevocable obedience. This is the essence of the doctrine of promissory estoppel, stated in Restatement of Contracts, Sec. 90, as follows:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is

binding if injustice can be avoided only by enforcement of the promise." [17]

Since, as we have seen, the Directive was a lawful command to Schering, which was subject to such authority, "the promisor (Schering) should reasonably expect (its promise) to induce action or forbearance of a definite and substantial character on the part of the promisee (the Alien Property Custodian)", to wit, the sale of Schering's stock by its then owner, the Alien Property Custodian, to third parties. Schering's promise did "induce such action" by the Alien Property Custodian. "Injustice can be avoided only by enforcement of the promise" of Schering. Otherwise the Alien Property Custodian, acting for the benefit of this Government and its citizens, which sold its stock with the understanding that Schering's patents, both new and old, would be used in the future for the benefit of the Government and its citizens, would now find that these patents, by Schering's failure to keep its promise, were to be devoted to the use of Schering, and not to the use of this Government and its citizens. Accordingly, under the well settled doctrine of promissory estoppel, Schering's "promise" is binding.

Finally, the Trading With the Enemy Act, as seen above, authorizes the Alien Property Custodian to "compel * * * any * * * use * * * of * * * any property in which any foreign country or a national thereof has any interest". Section 5, supra. Clearly the Custodian had the right by his Directive to compel Schering to transfer the "old" patents for the use of this Government and its citizens and to keep the "new" patents available for free licensing to the same end. Promissory though it was, this Directive as to the "new" patents was lawful. Turning to the Trading With the Enemy Act, we see that, by Section 17, this Court is given the express "jurisdiction to make and en-

ter * * * all such orders and decrees * * * as may be necessary and proper in the premises to enforce the provisions of this Act * * *." Thus this Court has the right to order Schering to comply with this lawful Directive of the Alien Property Custodian, in exactly the same way that the District Court had the right to order the summary turn-over of the alien property, lawfully demanded by the Custodian in Central Union Trust Co. of New York v. Garvan, 1920, 254 U.S. 554, 566, 41 S.Ct. 214, 65 L.Ed. 403.

### The Directive As Administrative Procedure

Finally Schering attacks the Directive in question—that of the Alien Property Custodian to it of January 5, 1952—procedurally, claiming (a) that it did not contain the requisite findings, (b) that it was not published in the Federal Register. We take these contentions up in turn.

Succinctly stated, the answer to Schering's contentions are (a) the Directive did contain the necessary findings, (b) the Directive was not required to be published in the Federal Register.

But, in any event, since the underlying purpose of any such findings and of such publication is to give notice to the person affected by such administrative act, i. e., Schering, of the doing of such act and of its lawful basis, it should be noted that irrespective of such findings and lack of need of publication, in fact Schering knew all about the doing of such acts and that they had lawful basis. Schering has stipulated in evidence a series of documents. Schering has further stipulated: "The parties agree that such documents reflect actual supervision and control of and over Schering Corporation by the Custodian and his successor as those terms are employed in common usage." Schering has also stipulated: "Defendant Schering Corporation * * was owned by German stockholders * * *." [18] Schering has further stip-

---

17. See accord: 1 Corbin, Contracts, page 664, 3 Pomeroy's Equity Jurisprudence, 5th Ed., Sec. 808b.

18. Stipulation August 10, 1954, paragraphs 14, 15. Stipulation June 9, 1954, paragraphs 6, 7.

ulated: "After the vesting" of Schering's stock by the Alien Property Custodian "Schering Corporation conducted its business pursuant to documents issued from time to time by the Alien Property Custodian or the Attorney General as his successor." It is thus clear that even if the Directive in question was technically faulty, (which is not the case, as will shortly be seen) Schering was in no way misled thereby, but understood the transaction and its lawfulness completely.

We accordingly turn to the consideration of whether there is any basis for Schering's above purely technical contentions.

■ The Trading With the Enemy Act, Title 50 U.S.C.A.Appendix, § 5(b)(1)(B) authorizes the President "through any agency that he may designate * * * to * * * direct and compel * * * any * * * use * * or dealing in * * * any property in which any foreign country or a national thereof has any interest * * *." Upon the delegation of such powers to the Alien Property Custodian, the Alien Property Custodian may therefore *supervise,* upon a finding that the stockholders of Schering were German nationals, the use of the Schering patents and the sale of its stock thereafter, since such stockholders had an interest in both such patents and such stock. Such supervision is therefore conditioned upon (1) such delegation to the Alien Property Custodian, (2) such finding that the Schering stockholders were German. This delegation has in fact occurred by orders expressly referred to in the Directive in question, and indeed as indicated in Schering's above stipulation. The finding that the Schering stockholders were German nationals has also been made in orders expressly referred to in the Directive in question and as expressly stipulated by Schering above.

[20] Furthermore, the same section of the act later provides that "any property or interest of any foreign country or national thereof shall vest" in the Alien Property Custodian when designated, "and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States." Upon findings similar to the above the Alien Property Custodian could therefore, as it did, vest the stock and patents of Schering and thereafter sell or otherwise deal with them "in the interest of and for the benefit of the United States." These statutory provisions, upon similar findings, combine the power to vest with the power to administer or otherwise deal with the Schering stock. When such stock was vested in the Alien Property Custodian, he could therefore administer it so as to control the Schering Corporation as a "one-man corporation", as seen above. He could thus, by controlling the Schering directors and officers, compel the very handling of the Schering patents, even if they had not been vested in him, and the sale of its stock, after the carving out of such patents, as he did in the Directive in question. Of course the Alien Property Custodian must take such action "in the interest of and for the benefit of the United States."

This course apparently is exactly what the Alien Property Custodian did in fact by this Directive. For the Directive expressly states that it "is issued under the authority of the Trading With the Enemy Act", which authorizes such broad vesting, administering and supervising powers. It further recites "Executive Order 9193, as amended", which expressly establishes the Alien Property Custodian originally as the agency delegated by the President to execute such powers. The Directive also expressly re-

---

Indeed, plaintiff's brief states that Schering's present President and counsel in this case were during much of the period in question serving in the Alien Property Custodian's Office in connection with the administration of Schering by that office.

cites Executive Order 9788, 50 U.S.C.A. Appendix, § 6 note, which, in turn, expressly transfers such delegated powers from the Alien Property Custodian to the Attorney General or to "such officers and agencies of the Department of Justice as he may designate". The Directive further expressly recites the Department of Justice order No. 3732 Supp. 51, which in turn expressly designates the "Office of Alien Property" to act for the Attorney General in that regard. And the Directive itself is signed by the "Director, Office of Alien Property".

Thus the authority to issue such a Directive is shown by the recitals of the Directive itself to be complete in the official who issued it in fact.

 As to the property and interests dealt with by the Directive, the instrument first refers expressly to the various vesting orders [19] which have been entered covering the Schering stock and patents and other matters, and states the effect of such orders. These vesting orders in turn recite their statutory bases as being the properties or interests of German Nationals [20] and that such properties or interests are "to be * * * dealt with in the interest of and for the benefit of the United States." Thus the Directive makes every finding requisite for its issuance in connection with such vesting orders, exactly as the Trading With the Enemy Act indicates. To restate in words in the Directive the lengthy recitals as to the respective bases for the entry of such various vesting orders—as set out in the above lengthy footnote—would, of course, make the Directive an extremely and unduly complicated and verbose instrument. The Alien Property Custodian rightly adopted the commonsense alternative of referring expressly in the Directive to these various vesting orders which contained such lengthy basic recitals.

19. Vesting Orders No. 4, 139, 3328, 68, 9704, 18,685.

20. Vesting Order 4 recites that the property vested "is the property of nationals of a foreign country designated in Executive Order 8389 as amended as defined therein and that the action herein taken is in the public interest * * *."

Vesting Order 68 recites that the property therein vested is "property in which nationals of a foreign country (Germany)" have interests.

Vesting Order No. 139 recites that the property is in one instance "property within the United States owned or controlled by nationals of a designated enemy country (Germany)" and in another instance is "property of and, represents an interest in said business enterprise which is, a national of a designated enemy country (Germany) and determining that to the extent that any or all of such nationals are persons not within a designated enemy country the national interest of the United States requires that such persons be treated as nationals of such designated enemy country."

Vesting Order No. 3328 recites that Schering "is a business enterprise within the United States", that certain named stockholders of Schering are "acting for and on behalf of nationals of a designated enemy country (Germany)" and that such shares of stock "are therefore property of nationals of a designated enemy country (Germany) and represent interests in said business enterprise which is a national of a designated enemy country (Germany) and determining that to the extent that any or all of such nationals are persons not within a designated enemy country such persons are controlled by or acting for or on behalf of a designated enemy country (Germany) or a person within such country and that the national interest of the United States requires that such persons be treated as nationals of such designated enemy country * * *."

Vesting Order 9704 recites "that Schering A G is a corporation organized under the laws of, and having its principal place of business in, Germany and is a national of designated enemy country (Germany)" and that certain agreements between Schering A G and defendant Schering are "property within the United States owned or controlled by, * * * the aforesaid national of a designated enemy country ,(Germany) ; and it is hereby determined: 3 that to the extent that the person referred to * * * is not within a designated enemy country, the national interest of the United States requires that such person be treated as a national of a designated enemy country (Germany)."

Vesting Order 18685 recites "that Schering A G * * * is * * * a national of a designated enemy country (Germany)."

In addition, bearing in mind that the statute itself, as to property vested, authorizes that same be "administered" by the President's designated agency, the Directive further recites: "In the exercise of the authority and functions vested in or delegated to the Attorney General under the Trading With the Enemy Act as amended, and in the *administration* of the property and interests vested in him as aforesaid, the Attorney General after investigation has determined it to be in the interest of and for the benefit of the United States that" (italics this Court's) the agreement attached to the Directive be executed by Schering, as in fact it thereafter was. This obviously gave those faced with the Directive notice of the exact bases for the issuance of such Directive as such bases are recited in the statute, the various Executive Orders and the various Vesting Orders, each and all of which are expressly named in such Directive. Surely, the above recitals in the Directive notified Schering that the Alien Property Custodian had "substantially (complied) comply with all the statutory requirements." (Parentheses the Court's) Mahler v. Eby, 1923, 264 U.S. 32, 44, 44 S.Ct. 283, 288, 68 L.Ed. 549; Public Utilities Commission of Conn. v. Federal Power Commission, 3 Cir., 1953, 205 F.2d 116. The Supreme Court's use of the word "substantially" shows that it does not intend to make a fetish of a mere form of words.

So far we have been considering Schering's purely technical attack upon the administrative procedure of the Alien Property Custodian in dealing with Schering, solely with reference to such action as the statute expressly authorizes in connection with, or following, a vesting. Now we turn to the consideration of the Alien Property Custodian's administrative procedure as the statute expressly authorizes it alternatively, and quite regardless of whether or not there has been any vesting. In this latter regard the statute, as above quoted, says that the Alien Property Custodian, or his successor, as the delegate of the President, may, among other things "direct and compel * * * any * * use * * * or dealing in * * * any property in which any foreign country or a national thereof has any interest * * *." [21] It will be noted that neither these and their correlated provisions of the statute, nor the provisions of the statute which are expressly connected with a vesting, use the word "supervise". While supervision is doubtless one of the ways in which the properties or interests in question may be used or dealt in, on the one hand, or in which such properties or interests may be vested and administered in the alternative, so that the use of the word "supervise" is proper, supervision is by no means the only way in which such property or interests may be used, dealt in, or administered. The power of the Alien Property Custodian in that regard is much broader than mere supervision, and practically authorizes him to control such property or interests for national purposes in practically any way he desires. Furthermore, as seen above, Schering has stipulated that it "was owned by German stockholders". Hence Schering's property, patents and all the rest of it, was "property in which any foreign country or a national thereof has any interest." Schering is thus subject in fact to this alternative form of control by the Alien Property Custodian. It has further been shown above that the Office of Alien Property which issued the Directive in question was the President's delegate to "direct and compel" the "use * * * or dealing in" of Schering's property. Thus the Alien Property Custodian had the authority in fact to issue the Directive in question compelling Schering to use all its properties, including its patents, in the way the Directive required.

The sole remaining question—purely technical in fact—is whether this Directive, issued to Schering, whose officers in fact knew all about the lawful basis of.

21. Trading With the Enemy Act, Title 50 U.S.C.A.Appendix, § 5(b) (1) (B).

such Directive, had sufficient recitals to give technical notice of such lawfulness, to those in fact acquainted with its lawfulness.

We turn to the terms of this Directive of January 5, 1952.[22] This instrument recites first the long series of vesting orders above referred to and their effect.[23] As seen above, these vesting orders all recited in substance the finding and adjudication of Schering as being the property or interest of German stockholders, and thus subject either to such vesting or to the control, including supervision, alluded to in the above alternative statutory provisions.[24] Accordingly, the Directive continues: "Schering Corporation is subject to the supervision, jurisdiction and control of the Attorney General under the authority of the Trading With the Enemy Act as amended". Thus, instead of repeating verbatim the lengthy complicated recitals of all these vesting orders as to the German ownership and control of Schering, which would make the Directive even more complicated and difficult to understand, the Directive simply refers expressly to these previous vesting orders, which in so many words show Schering repeatedly to have been adjudicated to be subject to the Alien Property Custodian's "supervision, jurisdiction and control". Thereafter the Directive, after stating how that control is to be exercised, and how Schering is to comply therewith by executing the agreement attached to the Directive, proceeds to cite the series of executive and other orders, all previously alluded to, which vest in the Office of Alien Property in the Attorney General's Office, which signed the Directive, the authority to act as the President's delegate in carrying out the Trading With the Enemy Act.

Hence the Directive in question itself sets forth in the clearest possible fashion, both the authority of its signer to issue it, and the repeated previous adjudications of Schering as being subject to the very control or supervision which the Directive requires. Since it would have been impracticable, as unduly complicating the Directive, to have attempted to include in it in extenso these repeated adjudications as to Schering and the bases therefor, plus the devolution of authority from the President, through various hands, to the Office of Alien Property, surely the official who signed the Directive was authorized to incorporate these multitudinous recitals and adjudications by express reference to the various orders which contained them and their bases. Surely the Directive, under these provisions of the Trading With the Enemy Act, just as in the case of the alternative provisions of such act above alluded to, has "substantially" complied with the requirement as to setting forth the bases for such administrative action, in order to put those affected by the Directive on notice of its propriety, and this quite regardless of the fact that they knew all about the situation in the first place.

Thus the Directive in question, upon the alleged unlawfulness of which Schering must stand or fall, is shown itself to constitute a lawful administrative order, subjecting Schering, as it says in so many words, "to the supervision, jurisdiction and control of the Attorney General under the authority of the Trading With the Enemy Act as amended."

Having thus shown that Schering's claim is baseless that the Directive in question does not lawfully subject it to the Alien Property Custodian's supervision, jurisdiction and control, under either of the alternative statutory provisions authorizing such supervision, jurisdiction and control, it is somewhat of a work of supererogation to go further and to show that Schering, previous to the Directive, had been adjudicated as subject to his supervision, jurisdiction and control, so that such adjudication in

22. See footnote 3.

23. Vesting Orders 4, 139, 3328, 68, 9704, 18685.

24. See footnote 20, quoting the lengthy pertinent recitals as to the German stock ownership and control of Schering.

the Directive itself was unnecessary. However, we briefly turn to but two of such orders on Schering.

Some six years before the issuance of the Directive in question, to wit, on October 14, 1946, Order 2 [25] was issued under General Order 35 by the Alien Property Custodian. This recited certain of the Vesting Orders above alluded to [26] which, as seen above, adjudicated Schering as being "property in which any foreign country or a national thereof has any interest" because of its German stock ownership. After reciting this statutory basis which suffices either for dealing with Schering or vesting its stock, this order stated "that the Alien Property Custodian * * * has assumed supervision, jurisdiction and control of said corporation pursuant thereto (such vesting orders) and by virtue of General Order No. 31."

Again, three years later, and three years before the Directive in question, to wit, on April 8, 1949, the Director of the Office of Alien Property wrote Schering a lengthy Directive.[27] This Directive again recited Vesting Orders 4, 139, 3328, which found and adjudicated Schering as above to be the property of a German national. Accordingly, the Directive stated: "the Alien Property Custodian vested 44,000 shares of the no par value common stock and 2,225 shares of no par value preferred capital stock of Schering Corporation, a New Jersey corporation, and assumed supervision, jurisdiction and control of said corporation". Thereafter this letter of instruction gave Schering specific orders as to what to do with certain of its patents and other matters.

In short, contrary to Schering's contentions, no matter whether we look at the matter under the provisions of the Trading With the Enemy Act which combined Schering's administration with the vesting, or whether we look at it under the alternative statutory provisions, independent of a vesting, we find that Schering has been repeatedly adjudicated to be subject to the administration, jurisdiction, supervision and control of the Alien Property Custodian, under orders which have repeatedly recited, in substance, the lawful bases for such action.

Thus the Alien Property Custodian has "substantially" not only made the findings, but recited such findings, in its various orders to Schering, including the Directive of January 5, 1952 in question, and such Directive, and its previous orders, as well, are lawful, as giving proper notice to Schering, regardless of Schering's actual knowledge thereof in fact.

### The Non-Publication of the Directive

Schering claims that since the Directive of January 5, 1952, which they now attack, was not published in the Federal Register, it is therefore void. This Directive (see footnote 3) was not issued for the guidance of the public or of a certain class, but was an Order issued to a single named person, the Schering Corporation. Furthermore, the question is, not what may have been published with regard to certain similar matters in the past, but what the law requires to be published in that regard.

Clearly, the Federal Register Act [28] does not require such publication. The Directive (1) is not a Presidential

25. Exhibit attached to Stipulation of June 9, 1954.

26. Vesting Orders Nos. 4, 139 and 3328.

27. Exhibit attached to Stipulation of June 9, 1954.

28. Federal Register Act, 49 Stat. 501, 44 U.S.C.A. § 305.
"(a) There shall be published in the Federal Register (1) all Presidential proclamations and Executive orders, except such as have no general applicabil-

ity and legal effect or are effective only against Federal agencies or persons in their capacity as officers, agents, or employees thereof; (2) such documents or classes of documents as the President shall determine from time to time have general applicability and legal effect; and (3) such documents or classes of documents as may be required so to be published by Act of the Congress: *Provided,* That for the purposes of sections 1–10, 11, 12–14 of this Act every document or order which shall prescribe a penal-

proclamation or Executive Order, (2) it has no general applicability, and the President has not determined that it had such general applicability, (3) the Congress has not required it to be published, (4) it does not "prescribe a penalty", nor (5) do the Regulations, as approved by the President, require its publication. These, and these alone, are the classes of documents required to be published by the Federal Register Act itself.

The Regulations prescribed under the Federal Register Act substantially direct the publication of Presidential Proclamations and Executive Orders and documents submitted for publication by the President. These do not cover the Directive in question. Also such documents are by regulation to be deemed to have "general applicability and legal effect", within the meaning of the Federal Register Act, and as such to be published if they are ones "prescribing a penalty or a course of conduct, conferring a right, privilege, authority or immunity, or imposing an obligation, and relevant or applicable to the general public, the members of a class or the persons of a locality, as distinguished from named individuals or organizations * * *." Obviously, the Directive in question clearly applies to a named individual or organization. When an order is directed to a certain individual, as Schering here, it is not of general applicability and so need not be published. Toledo, P. & W. R. R. v. Stover, D.C.S.D.Ill.N.D.1945, 60 F.Supp. 587; R.F.C. v. United Distillers, D.C.Conn.1952, 113 F.Supp. 468, 481, affirmed 2 Cir., 1953, 204 F.2d 511. It is not required to be published by act of Congress. Thus it is not required to be published by the Regulations.[29] This argument of Schering's concerning the non-publication of the Directive is thus untenable.

Nor does Hotch v. U. S., 9 Cir., 1953, 208 F.2d 244, support Schering's contention. There an act of Congress required the publication of a Regulation, which had not been published. An indictment for a criminal violation of such Regulation followed. Hence the court held invalid a conviction under such indictment.

But Congress, as seen above, has not required the publication of the Directive involved in the case at bar.

Schering finally argues that the Government's patent policy upholding enemy patents for the benefit of the United States and its citizens is void because it was not published in the Federal Register. This argument is based on the Administrative Procedure Act, § 3(a) (3), 60 Stat. 238, 5 U.S.C.A. § 1003.[30]

---

ty shall be deemed to have general applicability and legal effect.

"(b) In addition to the foregoing there shall also be published in the Federal Register such other documents or classes of documents as may be authorized to be published pursuant hereto by regulations prescribed hereunder with the approval of the President, but in no case shall comments or news items of any character whatsoever be authorized to be published in the Federal Register."

29. 13 F.R. 5930, Title 1 CFR, 1949 Ed., Ch. I, Sections 1.31–1.33:

Sec. 1.31 *Proclamations and Executive orders.* All Presidential proclamations and Executive orders in the numbered series, and all other documents which the President submits for publication or orders to be published, shall be filed in the office of the Director and published in the Federal Register.

Sec. 1.32 *Documents having general applicability and legal effect.* Every document, issued under proper authority, prescribing a penalty or a course of conduct, conferring a right, privilege, authority or immunity, or imposing an obligation, and relevant or applicable to the general public, the members of a class or the persons of a locality, as distinguished from named individuals or organizations, is hereby determined to have general applicability and legal effect. Such documents shall be filed in the office of the Director and published in the Federal Register.

Sec. 1.33 *Classes created by act of Congress.* Such documents or classes of documents as are required so to be published by act of Congress shall be filed in the office of the Director and published in the Federal Register.

30. "Except to the extent that there is involved (1) any function of the United States requiring secrecy in the public

In short, Schering contends that this policy was one adopted by the Alien Property Custodian "for the guidance of the public".

Of course everything done by the Government in its manifold activities as the servant of the public is of interest to the public in one way or another. So if these words "for the guidance of the public" are to include all matters of interest to the public in any way, then every single governmental act which is in writing will have to be published—an obvious absurdity. Of course, what is meant by a policy adopted for the guidance of the public, is a governmental plan or procedure which the public is required to obey or with which it is to avoid conflict.

On the contrary, however, the decision of the Alien Property Custodian, to have the Government either own or control most of Schering's patents, was one primarily affecting the operation of a governmental agency itself, and was not a policy requiring obedience or compliance on the part of the citizens at large. Clearly, this governmental patent policy which had existed for many, many years, was not required to be published by the Administrative Procedure Act.

The fact that the Executive Orders of the President of the United States regarding this policy had been previously published, does not prove that the policy itself had to be published. Such publication occurred because they were Executive Orders.[31] This final contention of Schering is untenable.

## Conclusion

In short (1) the Alien Property Custodian, as the "one-man" in a "one-man corporation" had the right, under New Jersey corporation law, to compel Schering, all of whose stock he owned, to do his bidding in corporate form, just as was done in fact. (2) Irrespective of his rights under New Jersey corporation law, the action of the Alien Property Custodian was a valid exercise of his rights under the valid Trading With the Enemy Act, in directing Schering's officers and directors, by the papers they received, executed, and signed, to assign the old patents to him for the use of the Government and its citizens and to freely license the new patents for an arbitrated fee. (3) The Alien Property Custodian's right so to deal with the so-called "new" patents was in no way affected by the Joint Congressional Resolution terminating hostilities with Germany. (4) The compulsion exercised by the Alien Property Custodian upon Schering in having it execute the paper attached to the Directive was not wrongful duress, but lawful compulsion. (5) Schering "understood" this lawful Direc-

---

interest or (2) any matter relating solely to the internal management of an agency—

"(a) Every agency shall separately state and currently publish in the Federal Register (1) descriptions of its central and field organization including delegations by the agency of final authority and the established places at which, and methods whereby, the public may secure information or make submittals or requests; (2) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal or informal procedures available as well as forms and instructions as to the scope and contents of all papers, reports, or examinations; and (3) substantive rules adopted as authorized by law and statements of general policy or interpretations formulated and adopted by the agen-

cy for the guidance of the public, but not rules addressed to and served upon named persons in accordance with law. No person shall in any manner be required to resort to organization or procedure not so published.

"(b) Every agency shall publish or, in accordance with published rule, make available to public inspection all final opinions or orders in the adjudication of cases (except those required for good cause to be held confidential and not cited as precedents) and all rules.

"(c) Save as otherwise required by statute, matters of official record shall in accordance with published rule be made available to persons properly and directly concerned except information held confidential for good cause found."

31. 44 U.S.C.A. § 305(a) (1, 2) Federal Register, par. 1.31

tive and that the Alien Property Custodian was selling the Schering stock owned by him in derogation of his rights, and in the ultimate interest of the Government and the people of the United States. (6) Procedurally, the Directive in question here was the lawful exercise of the administrative authority of the Alien Property Custodian, such exercise being carried out in a lawful form and as to a matter which was not required to be published in the Federal Register. (7) This Court has the power and duty to order Schering to comply with this lawful exercise of the rights of the Alien Property Custodian.

Schering must therefore comply with its written "promises" of obedience to this Directive of the Alien Property Custodian, which commanded not only "execution" of the agreement which contained such promises, but their "performance". Schering's counterclaim, asking for rescission of such Directive and the agreement it covered, plus the return of any property turned over to the Alien Property Custodian accordingly, does not state a claim upon which relief can be granted.

Plaintiff's motion to dismiss defendant's counterclaim will therefore be granted.